863 F.2d 1537
 1989 A.M.C. 1259
 SONY MAGNETIC PRODUCTS INC. OF AMERICA, Plaintiff-Appellee,
v.
MERIVIENTI O/Y, d/b/a Finnlines Ltd., Enso Gutzeit O/Y, O/Y
Finnlines, Ltd., Atlantic Cargo Services, Strachan Shipping
Company, in personam, M/V FINNHAWK, her engines, hull,
tackle, appurtenances, etc., in rem, Defendants-Appellants.
 No. 87-7614.
 United States Court of Appeals,
Eleventh Circuit.
 Jan. 23, 1989.
 
 Sidney H. Schell, Mobile, Ala., for defendants-appellants.
 Johnstone, Adams, Bailey, Gordon & Harris, Thomas S. Rue, Mobile, Ala., for plaintiff-appellee.
 Appeal from the United States District Court for the Southern District of Alabama.
 Before TJOFLAT and KRAVITCH, Circuit Judges, and PAINE*, District Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 Various entities associated with the M/V Finnhawk, a container ship, appeal from a district court order finding them liable under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. Sec. 1300 et seq., for damages sustained to the plaintiff's cargo while being loaded on board the Finnhawk. We affirm.
 
 I.
 BACKGROUND
 
 2
 Sony Magnetic Products, Inc. of America ("Sony") operates a plant in Dothan, Alabama for the manufacture of magnetic video cassette tapes. In early March of 1982, Sony contacted Page & Jones, a freight forwarder with offices in Mobile, Alabama, to arrange for the transportation of a container of video cassette tapes to England. Page & Jones, through Gas & Equipment Transport, Inc., a non-vessel operating common carrier, reserved space for Sony's cargo with Atlantic Cargo Services on board the Finnhawk.
 
 
 3
 In mid-March of 1982, at the Dothan plant, Sony packed its cargo of LS-435 and L-830E video cassette tapes into a standard shipping container, measuring 40 feet long by 8 feet wide by 8 feet high. Sony first placed the tapes into 1320 cardboard cartons and then strapped the cartons onto 52 wooden pallets, which were forklifted into the container. Shortly afterwards, Sony delivered the container to Strachan Shipping Company, general agents for Atlantic Cargo Services, at the Alabama State Docks in Mobile, Alabama. When the container was delivered to the dock, Gas & Equipment issued Sony a bill of lading, which had been prepared by Page & Jones. The bill of lading is blank under the heading "No. of Pkgs.," but under the heading "Description of Packages and Goods," it states "1 X 40 foot container STC [said to contain]: 1320 Ctns. Magnetic Tapes (blank)." The bill of lading did not reserve space for designating the value of the cargo, but the attached export certificate showed a value of $424,765.44.
 
 
 4
 On March 26, 1982, as the Finnhawk's deck crane was lifting the container of Sony's tapes up to the vessel's cargo deck, the hydraulic motor of the crane exploded, or catastrophically failed in some manner, causing the container to drop approximately sixty feet to the concrete loading deck below. An immediate, cursory examination of the container suggested that the cargo had been damaged; consequently, Atlantic Cargo Services decided not to load the container of tapes aboard the Finnhawk, but instead stored it in a warehouse at the docks and contacted Sony.
 
 
 5
 Two weeks after the accident, Sony inspected the cargo to more fully assess the damages. Sony's inspectors opened those cartons of tapes that appeared the least damaged and, upon close examination, discovered that even the tapes in these cartons had been damaged. Based upon this inspection of a representative sample of the cargo, Sony concluded that all the tapes were unmarketable as new merchandise and agreed with its underwriter to negotiate for their salvage. Salvage negotiations were unsuccessful, however, because Sony refused to allow the tapes to be marketed as "seconds" with only a nonwarranty sticker on them and without removal of certain embossed marks identifying the tapes as Sony's products.[1] Sony ultimately purchased the damaged cargo from its underwriter for $65,000 and destroyed the tapes.
 
 
 6
 On September 21, 1983, invoking the admiralty jurisdiction of the district court, Sony filed suit in personam against (1) Merivienti O/Y, the manager of the Finnhawk, (2) Enso Gutzeit O/Y and O/Y Finnlines, Ltd., the owners of the Finnhawk, (3) Atlantic Cargo Services, Inc., the charterer and operator of the Finnhawk, and (4) Strachan Shipping Company, general agents for Atlantic Cargo Services.[2] Sony also filed suit in rem against the Finnhawk, but never perfected service against the vessel. Sony's complaint, seeking recovery under breach of contract and negligence theories, alleged that the act or omission of one or all of the defendants caused the damage to its video cassette tapes. In their answer, the defendants asserted various defenses under COGSA. Although Sony had not relied upon COGSA in its complaint, it agreed prior to trial that this statute governed the instant action.
 
 
 7
 After a bench trial, the district court issued a memorandum opinion finding the defendants liable for the damage to Sony's tapes and awarding damages of $424,765.44, the invoice value of the tapes, plus prejudgment interest. 668 F.Supp. 1505. The district court later made minor modifications in its original memorandum opinion, but left intact the awarded damages and interest. This appeal followed.
 
 II.
 LIABILITY
 
 8
 The first issue on appeal is whether the district court properly imposed liability on the defendants under COGSA for the damage to Sony's video cassette tapes. A shipper establishes a prima facie case under COGSA by proving that the carrier received the cargo in good condition but unloaded it in a damaged condition. Terman Foods, Inc. v. Omega Lines, 707 F.2d 1225, 1227 (11th Cir.1983). A carrier can rebut a shipper's prima facie case by establishing either that it exercised due diligence to prevent the damage to the cargo by properly handling, stowing, and caring for it in a seaworthy ship, 46 U.S.C.App. Sec. 1303(1) & (2), or that the harm resulted from one of the excepted causes listed in section 1304(2). Terman Foods, 707 F.2d at 1227. If the carrier is able to rebut the shipper's prima facie case, the burden then shifts back to the shipper to show that the carrier's negligence was, at the least, a concurrent cause of the loss. Id.
 
 
 9
 At trial, in an effort to rebut Sony's prima facie case, the defendants attempted to establish that the accident that caused the damage to Sony's cargo was the result of a latent defect in the motor of the Finnhawk's crane, one of the enumerated exceptions to liability in section 1304(2) of COGSA.[3] In particular, one of the defendants' experts, a metallurgist, testified that microscopic cracks in the pistons of the crane's motor, created during the manufacturing process and aggravated by fatigue, caused the explosion. According to this expert, the ship's crew could not have discovered these cracks by inspecting the motor. The defendants' other expert, a marine surveyor, also opined that the accident was caused by a latent defect. In addition, crewmembers of the Finnhawk maintained that there had been no complaints about or problems with the crane and that it had always been properly maintained and inspected. In contrast, Sony's expert, also a metallurgist, testified that the central cause of the accident was a malfunctioning stop switch on the crane, a defect about which the defendants either did know or should have known.
 
 
 10
 The district court found that the "plaintiff's expert presented the more credible explanation of the catastrophic motor failure" and was "unable to find as a fact that the failure was caused, either directly or proximately, by fatigue cracks or cracks created during the process of manufacturing the pistons." The district court rejected the defendants' theory of the cause of the accident because it failed to explain certain physical evidence that Sony's theory was able to explain. Moreover, the court found that the defendants' "evidence suggesting that the crane was properly maintained at all pertinent times is inconclusive," and was "unable to find that [the Finnhawk's crewmembers] took the steps necessary to insure [the crane's] proper operation on the occasion of the accident which caused plaintiff's loss." Based upon its factual findings, the district court concluded, as a matter of law, that the defendants had not sustained their burden of proving that Sony's loss was caused by a latent defect and consequently had not rebutted Sony's prima facie case under COGSA.
 
 
 11
 The defendants maintain that the district court erred in concluding that they did not bear their burden of proving the latent defect defense.[4] In so arguing, the defendants do nothing more than point out various inconsistencies and other weaknesses in the testimony of Sony's expert in an attempt to discredit Sony's theory of the cause of the accident. This argument, however, ignores the allocation of burdens of proof outlined in COGSA: Sony did not have to prove that the accident was not caused by a latent defect; instead, to rebut Sony's prima facie case under COGSA, the defendants bore the burden of proving that the accident was the result of a latent defect. As the district court's order made clear, the defendants' evidence failed to establish this crucial fact. The district court explicitly rejected the defendants' theory that the accident was caused by cracks in the motor's pistons and noted the inconclusiveness of the defendants' evidence that the crane was working properly. Having reviewed the record, we conclude that these findings are not clearly erroneous and thus cannot be overturned on appeal. Fed.R.Civ.P. 52(a); McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954). Except for the evidence that the district court discredited, the defendants offered no proof to support their latent defect defense. Consequently, we affirm the district court's legal conclusion that the defendants failed to rebut Sony's prima facie case under COGSA.
 
 III.
 DAMAGES
 
 12
 The defendants' next argument is that the damages awarded to Sony were excessive because the district court (a) misapplied section 1304(5) of COGSA, which limits carriers' liability, and (b) failed to reduce the damages by $65,000, the amount that Sony paid its underwriter for the tapes. We will consider each part of this argument separately.
 
 A.
 
 13
 In pertinent part, section 1304(5) of COGSA provides as follows:
 
 
 14
 Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier.... In no event shall the carrier be liable for more than the amount of damage actually sustained.[5]
 
 
 15
 Concluding that Sony did not declare the value of the cargo on the bill of lading,[6] the district court relied on the $500 per package limitation to determine damages. The court found that each of the 1320 cartons was a "package" for purposes of COGSA, capping liability at $660,000, and then awarded $424,765.44, the actual damages sustained by Sony as evidenced by the invoice value of the tapes.
 
 
 16
 The defendants argue that the district court should have counted the 52 pallets, not the 1320 cartons, as the COGSA packages, which would have limited their liability to $26,000.[7] We disagree. This case is analogous to Vegas v. Compania Anonima Venezolana de Navegacion, 720 F.2d 629 (11th Cir.1983), in which the shipment consisted of 109 cartons of auto brake parts consolidated onto two pallets. The carrier issued a bill of lading containing columns for the shipper to designate the number of packages and describe the cargo. In the "No. of Pkgs." column, the shipper wrote "2." In the column headed "Shipper's Description of Packages and Goods," the shipper made the following entry: "Palletized master cartons, STC [said to contain]: 109 cartons: auto brake parts." When the cargo did not reach its destination, the shipper sued; the carrier admitted liability but asserted that damages should be limited under section 1304(5) of COGSA. The only contested issue was whether the $500 per package limitation applied to the two palletized "master cartons" or to the 109 cartons contained inside.
 
 
 17
 Noting that Congress had not defined the word "package" in COGSA, the Vegas court recognized that "both the individual and master cartons could fit within" the ordinary definition of the word package. To resolve this ambiguity, the Vegas court relied on the legislative history of COGSA and concluded that the package limitation applied to the 109 smaller cartons. As the court remarked, "the COGSA limitation was enacted in 1936 to restrain the superior bargaining power wielded by carriers over shippers. Its purpose was to set a reasonable limitation on liability which carriers by law could not reduce by contract." Id. at 630 (citing Allstate Ins. Co. v. Inversiones Navieras Imparca, C.A., 646 F.2d 169, 171 (5th Cir. Unit B 1981)). The Vegas court concluded that "[g]iven the congressional purpose to limit agreements restricting carriers' liability ... we doubt justification exists for restricting liability on the basis of consolidation into master cartons of packages to each of which, except for such consolidation, the five hundred dollar limitation would apply." Id. at 631. In effect, the Vegas court decided that an ambiguity on a bill of lading regarding the number of COGSA packages should be resolved in favor of the shipper. See also Allied Chemical Int'l Corp. v. Companhia de Navegacao Lloyd Brasileiro, 775 F.2d 476, 486 (2d Cir.1985) (ambiguities on bill of lading must be resolved against issuing carrier), cert. denied, 475 U.S. 1099, 106 S.Ct. 1502, 89 L.Ed.2d 903 (1986).
 
 
 18
 The facts of this case are even more favorable to the shipper than they were in Vegas. Like the shipper in Vegas, Sony consolidated cartons of goods onto pallets and informed the carrier on the bill of lading of the number of individual cartons. Unlike the shipper in Vegas, however, Sony did not disclose on the bill of lading that it had consolidated the cartons onto pallets. Thus, in this case there was no ambiguity on the bill of lading concerning the number of COGSA packages. Given the Vegas court's decision to resolve an ambiguity on the bill of lading regarding the number of COGSA packages in favor of the shipper, it follows that in this case, where there was no such ambiguity, the district court was correct in applying COGSA's $500 per package limitation to the 1320 cartons instead of the 52 pallets.
 
 
 19
 The defendants' reliance on Hayes-Leger Associates, Inc. v. M/V Oriental Knight, 765 F.2d 1076 (11th Cir.1985) to support their argument is misplaced. In Hayes-Leger, the plaintiff's five containers of woven baskets and rattan goods were damaged enroute from the Philippines aboard the defendants' vessels. The plaintiff had prepared the goods for shipment by wrapping and tying them into various bundles before packing them into the containers. Four of the five bills of lading listed as the number of packages the number of individual pieces of woven baskets and rattan goods, instead of the number of bundles into which the goods had been consolidated.[8] This court upheld the district court's decision that despite the designation on the bills of lading, the bundles, and not the individual pieces, were the COGSA packages. In affirming the district court, we stated that "where the shipper overstates the number of packages in a container, the COGSA liability limitation should be applied to the actual number of packages in the container." Id. at 1082.
 
 
 20
 The defendants interpret Hayes-Leger as standing for the proposition that the largest units into which goods are consolidated for transport, in this case the 52 pallets, should be considered the COGSA packages, regardless of what the bill of lading says.[9] The Hayes-Leger court, however, never held that the bundles constituted the COGSA packages because they were the largest consolidation of goods. Instead, the court in Hayes-Leger looked outside the bill of lading to determine the number of COGSA packages because the bill of lading listed as the number of packages the number of individual pieces of rattan goods, a description that "was insufficient to indicate to the carrier that the goods were 'packaged.' " See id. at 1081 n. 9. In this case there is no need to look outside the bill of lading to determine the number of COGSA packages because the bill of lading disclosed that Sony was shipping 1320 cartons, a description sufficient to inform the defendants that Sony's goods were packaged. See id.
 
 B.
 
 21
 The defendants next argue that the district court erred in not reducing the damages by $65,000, the amount that Sony paid to its underwriters for the tapes. The defendants maintain that this amount represented the salvage value of the tapes and, as such, should have been deducted from the award of damages. Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer, 422 F.2d 7, 18 (2d Cir.1969) (measure of damages is fair market value of goods less any salvage), cert. denied, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); Dixie Plywood Co. v. S.S. Federal Lakes, 404 F.Supp. 461, 466 (S.D.Ga.) (same), aff'd, 525 F.2d 691 (5th Cir.1975), cert. denied, 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976). The district court found, however, that "[t]here was no evidence ... that [the $65,000] payment from plaintiff represented the salvage value of the cassettes," and this finding was not clearly erroneous.[10] Consequently, we reject the defendants' argument that the award of damages should be reduced by $65,000.
 
 
 22
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable James C. Plaine, U.S. District Judge for the Southern District of Florida, sitting by designation
 
 
 [1]
 Sony's L-830E tapes have the Sony trademark embossed into the plastic at the bottom right-hand corner of the underside of the cassette. Also, "S.M.P.A. Inc." (standing for Sony Magnetic Products of America, Inc.) is embossed on the underside of both the L-830E and the LS-435 cassettes beneath the retainer lid. The Sony trademark is not embossed on the LS-435 cassettes
 
 
 [2]
 The district court granted summary judgment in favor of this defendant and Sony does not appeal this ruling
 
 
 [3]
 In pertinent part, Sec. 1304 provides as follows:
 (2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from--
 (p) Latent defects not discoverable by due diligence....
 A latent defect is one that could not be discovered upon reasonable inspection, Bubble Up Int'l Ltd. v. Transpacific Carriers Corp., 458 F.Supp. 1100, 1105 (S.D.N.Y.1978), or by any known and customary test, Waterman S.S. Corp. v. United States Smelting, Refining & Mining Co., 155 F.2d 687, 691 (5th Cir.), cert. denied, 329 U.S. 761, 67 S.Ct. 115, 91 L.Ed. 656 (1946).
 In the court below, the defendants also asserted the affirmative defenses contained in COGSA Sec. 1304(2)(n) (insufficiency of packing) and Sec. 1304(2)(q) ("any other cause arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier...."). The district court concluded, however, that the defendants had not met their burden of proving either of these affirmative defenses and the defendants do not appeal these rulings.
 
 
 [4]
 The defendants do not argue that Sony failed to establish a prima facie case
 
 
 [5]
 The bill of lading contained a clause almost identical to this provision of COGSA
 
 
 [6]
 An employee of Page & Jones, Sony's freight forwarder, testified that Sony rarely declared the value of ocean going cargo on the bill of lading because the value was considered a trade secret and the bill of lading is usually widely distributed
 
 
 [7]
 The defendants also argue, albeit less strenuously, that the district court should have counted the container as the COGSA package, thus limiting their liability to $500. This argument is without merit. In Allstate Ins. Co. v. Inversiones Navieras Imparca, C.A., 646 F.2d 169 (5th Cir. Unit B 1981) this court held that "at least when what would ordinarily be considered packages are shipped in a container supplied by the carrier and the number of such units is disclosed in the shipping documents, each of those units and not the container constitutes the 'package' referred to in [Sec. 1304(5) of COGSA]." Id. at 172 (quoting Mitsui & Co. v. American Export Lines, Inc., 636 F.2d 807, 817 (2d Cir.1981)). The court further held that cartons are "ordinarily ... considered packages" and concluded that 341 cartons shipped within a container, and not the container itself, were the COGSA packages. Based on Allstate, the defendants' argument must fail
 Hayes-Leger Associates, Inc. v. M/V Oriental Knight, 765 F.2d 1076 (11th Cir.1985) further supports our rejection of the defendants' argument. In Hayes-Leger, this court set down the following rules:
 (1) when a bill of lading discloses the number of COGSA packages in a container, the liability limitation of section 4(5) applies to those packages; but (2) when a bill of lading lists the number of containers as the number of packages, and fails to disclose the number of COGSA packages within each container, the liability limitation of section 4(5) applies to the containers themselves.
 Id. at 1080. Here, the bill of lading disclosed the number of COGSA packages, 1320 cartons, and did not list the number of containers as the number of packages. Thus, the liability limitation applies to the cartons and not to the container itself.
 
 
 [8]
 For example, one of the bills of lading listed the number of packages as "TWO THOUSAND SIX HUNDRED FORTY ONE PCS. ONLY." The goods were described as "2,641 PCS. WOVEN BASKETS AND RATTAN FURNITURE."
 
 
 [9]
 Taken to its logical extreme, this interpretation of Hayes-Leger would mean that the container itself should be considered the COGSA package for all shipments. As explained supra, in note 7, this argument is without merit
 
 
 [10]
 Sony tapes carry a lifetime warranty entitling the purchaser to exchange for a new tape any tape that stops working properly for any reason. The testimony at trial suggested that Sony paid the $65,000 to its underwriter to guarantee that the damaged tapes, still embossed with the Sony trademark, would never enter the market and subject Sony to possible future warranty claims