United States Court of Appeals,

Eleventh Circuit.

Nos. 95-3201, 95-3296.

HALE CONTAINER LINE, INC., Plaintiff-Counter-Defendant-Cross-Claimant-Appellee,

Societe Guyanaise De Conseils Immobilers (SOGUCI), Plaintiff-Appellant,

v.

HOUSTON SEA PACKING CO., INC., Defendant-Cross-Defendant-Counterclaimant-Appellant,

Meridian Ship Incorporated, Defendant-Cross-Defendant,

Fabricated Products of Tampa, Inc., Defendant-Cross-Defendant-Cross Claimant,

D&D Welding Fabrication, Defendant-Cross-Defendant-Cross Claimant,

Project Logistics and Transportation, Inc., Tug "ALEXANDRA HALE" *in rem*, Barge "LIBERTY TRADER" *in rem*, Defendants-Appellees,

National Cargo Bureau, Defendant-Cross-Claimant-Cross-Defendant,

London Offshore Consultants, Inc., Defendant-Cross-Defendant.

Hale Container Line, Inc., Plaintiff-Counterdefendant-Cross-Claimant,

Societe Guyanaise De Conseils Immobilers (SOGUCI), Plaintiff-Appellee,

v.

Houston Sea Packing Co., Inc., Defendant-Cross-Defendant-Counterclaimant-Appellant,

Meridian Ship Incorporated, Defendant-Cross-Defendant,

Fabricated Products of Tampa, Inc., Defendant-Cross-Defendant-Cross-Claimant,

D&D Welding Fabrication, Defendant-Cross-Defendant-Cross Claimant,

Project Logistics and Transportation, Inc., Tug "ALEXANDRA HALE" *in rem,* Barge "LIBERTY TRADER" *in rem,* Defendants,

National Cargo Bureau, Defendant-Cross-Claimant-Cross-Defendant,

London Offshore Consultants, Inc., Defendant-Cross-Defendant.

April 3, 1998.

Appeals from the United States District Court for the Middle District of Florida. (No. 90-216-CIV-T-21A), Ralph W. Nimmons, Jr., Judge.

Before HATCHETT, Chief Judge, BIRCH, Circuit Judge, and CLARK, Senior Circuit Judge.

CLARK, Senior Circuit Judge:

Defendant Houston Sea Packing Co., Inc. ("Houston") appeals the district court's judgments against it in favor of plaintiffs Hale Container Line, Inc. ("Hale") and Societe Guayanaise De Conseils Immobiliers ("SOGUCI"). SOGUCI cross-appeals from the judgment against it in favor of Hale, the National Cargo Bureau ("NCB"), and the Alexander Hale and Liberty Trader *in rem,* and the amount of damages it was awarded against Hale.

## I. BACKGROUND

In July 1989, Jean Pierre Porry, a representative of SOGUCI, contracted with Project Logistics and Transportation, Inc. ("Project Logistics") to arrange for the transport of 210 mobile homes from Tampa, Florida, to French Guyana.[1] A Project Logistics representative contacted Craig Firing of Meridian Shipping Inc. ("Meridian"), a shipping agency. Firing contacted Don Jones, the owner of Houston concerning the transportation of the mobile homes and the construction of a stanchion assembly to hold the homes during shipment.[2] Jones gathered information to determine

---

[1]SOGUCI had previously contracted with the European Space Agency to provide housing for workers constructing the Space Center in French Guyana. SOGUCI contracted with Florida Mercury to purchase the mobile homes from Fleetwood Homes. One of SOGUCI's principles, Michel Porry, asked his brother and maritime specialist Jean Pierre Porry to make the arrangements for the transportation of the mobile homes to French Guyana.

[2]R2-99 at 3; R11-9, 11, 13-14.

2

the method and costs of transporting the homes, and contacted London Offshore, a marine surveying company that approved vessels for hauling cargo, to assist him. On July 31, 1989, Meridian and Houston entered into a "Conlinebooking" Liner Booking Note[3] with Project Logistics for the shipment of 210 mobile homes on two voyages. The Booking Note named the "carrier" as "Meridian Ship/Houston Sea-Pack," the "merchant" or "shipper" as "Project Logistics and Transportation, Inc.," and the "vessel" as "Tug Barge(s) TBN." On August 4, 1989, Project Logistics and Florida Mercury Export, Inc.,[4] as SOGUCI's representative, executed a Booking Note which named the "carrier" as "Project Logistics," the "merchant" or "shipper" as "Florida Mercury," and the "vessels" as "Tug: "Carol Hale' Barge: "Liberty Trader.' " Both booking notes gave the time for shipment as "September 1989."

Houston contacted design engineer Arthur Tertyshny of Design Research for stress analysis of the stanchion system. Tertyshny provided drawings and calculations pertaining to a system containing three tiers of mobile homes.

---

[3]In admiralty, a "liner" is a cargo operation that sails along fixed routes on a preannounced schedule. Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 13 (2nd ed.1975). A shipper reserves or "books" space on a liner for the cargo. *Id.*

[4]Florida Mercury Export, Inc. was a U.S. corporation set up by Jacques Gallet, a Porry relative, to provide for the payment of the mobile homes and ocean freight in U.S. currency.

On August 28, 1989, Hale, as "Owner," and Houston, as "Charterer," executed a Time Charter[5] in which Hale chartered the tug "Alexandra Hale" and barge "Liberty Trader" to Houston. The Time Charter provided for payment as follows:

CHARTER HIRE PAYABLE: $100,000 wired to Owner's bank prior to departure from Baltimore. $150,000 wired to Owner's bank no later than 72 hours after departure from Tampa to South America on first and any successive trips, adjusted to projected charter hire to be earned.[6]

The Time Charter provided:

4. PAYMENT AND DEFAULT: In the event Charterer shall fail to pay hire or other money due hereunder, promptly on the date thereof, or fail to comply with any of the terms, provisions or conditions hereof, ... Owner shall have the option of terminating this agreement and Charterer shall forthwith surrender possession of said vessel to Charterer; ... and Charterer shall continue to remain liable for all sums then due hereunder, as well as for any and all other damages suffered by Owner.[7]

\* \* \* \* \* \*

12. LIENS: ... Owner shall have a lien on all cargoes and subfreights for all charter payments and general averages.[8]

\* \* \* \* \* \*

16. Owner and Charterer acknowledge that Charterer plans to add stanchions to the Liberty Trader. In consideration thereof, Charterer shall be fully responsible for, and fully indemnify Owner for, all claims, liability, costs, or expenses of any kinds, including attorney

---

[5]"A time charter is a contract of affreightment to use a ship in order to ship goods for a specific period of time. The carrier makes the ship's capacity available to the time charterer for this purpose. The charterer bears the expenses connected with each voyage and pays hire to the carrier based upon the time the ship is under charter." Thomas J. Schoenbaum, 2 *Admiralty and Maritime Law* § 11-5 (2nd ed.1994). An "affreightment" is a contract with a ship-owner to hire a ship, or part of it, for the carriage of goods, and is generally in the form of either a charter-party or a bill of lading. *Black's Law Dictionary* 60 (6th ed.1990).

[6]Pltf. Hale Trial Exh. 48 at 1.

[7]Pltf. Hale Trial Exh. 48 at 3 ¶ 4.

[8]Pltf. Hale Trial Exh. 48 at 4 ¶ 12.

fees, arising in any way or degree from addition of stanchions by Charterer to the Liberty Trader....[9]

The Alexandra Hale and Liberty Trader arrived in Tampa, Florida on September 6, 1989. Pursuant to the Time Charter, Houston arranged for an inspection and survey of both vessels. Houston discovered that the Liberty Trader had a breakwater on the bow that would displace five mobile homes on the bottom bow tier. Houston then decided to construct a fourth tier at the aft end of the barge to accommodate the displaced mobile homes.[10]

Pursuant to the Booking Note entered into between Houston and Project Logistics, Project Logistics was responsible for providing stevedoring services for the loading of the mobile homes onto the barge, securing and lashing the homes onto the stanchion system, and insuring that the nuts and bolts were securely fastened and tightened.[11]

On September 18, 1989, James McElroy, Project Logistics representative, and Harry C. Anderson, Master of the M/V Alexandra Hale, executed a Liner Bill of Lading[12] in Tampa, Florida,

---

[9]Pltf. Hale Trial Exh. 48 at 6 ¶ 16; Deft. Houston Trial Exh. 1 at 6 ¶ 16.

[10]Although Jones testified that he discussed this with Bill Lowe of London Offshore and engineer Tertyshny, Tertyshny stated that the decision to place the fourth tier was made "after he was out of it," and that if questioned about the possibility of adding a fourth tier, he would have changed his stress calculations.

[11]The stanchions were built by, obtained from, delivered by, and pre-assembled by Fabricated Products of Tampa ("Fabricated Products"). The stanchions were welded to the barge by Fabricated Products, D & D Welding Fabrication, and a third night crew. Project Logistics employed Metro Stevedores to load and discharge the mobile homes from the barge, bolt, secure and lash the mobile homes to the stanchion system, and insure that the nuts and bolts were securely fastened and tightened; and employed other stevedores to discharge the mobile homes in French Guyana.

[12]A Bill of Lading is a "document which is signed by the carrier or his agent acknowledging that goods have been shipped on board a specific vessel that is bound for a particular destination and stating the terms on which the goods are to be carried.... Each shipping line generally has its own form of bill of lading." 2 Schoenbaum, § 10-11 at 44 (2nd ed.1994).

and Meridian, as agent, executed a Liner Bill of Lading in Baltimore, Maryland, for the first shipment of the mobile homes. Each Bill of Lading contained a General Paramount Clause, providing that the Carriage of Goods by Sea Act applied, and included a list of terms and conditions, including:

> 5. The Scope of the Voyage.
>
> As the vessel is engaged in liner service the intended voyage shall not be limited to the direct route but shall be deemed to include any proceeding or returning to or stopping or slowing down at or off any ports or places for any reasonable purpose connected with service including maintenance of vessel and crew.
>
> * * * * * *
>
> 9. Live Animals and Deck Cargo shall be carried subject to the Hague Rules ... with the exception that notwithstanding anything contained in Clause 19 the Carrier shall not be liable for any loss or damage resulting from any act, neglect or default of his servants in the management of such animals and deck cargo.
>
> * * * * * *
>
> 13. Delay.
>
> The Carrier shall not be responsible for any loss sustained by the Merchant through delay of the goods unless caused by the Carrier's personal gross negligence....[13]

The first shipment of homes departed on board the barge from Tampa on September 23, 1989. However, after the vessels departed, the Tug began experiencing engine problems and had to return to Tampa for repairs. After the repairs were completed, the vessels again left Tampa. While en route to French Guyana, the Tug put into a port in Puerto Rico because one of its crew became ill, and later put into Martinique because of more engine problems. The Tug arrived in French Guyana on October 13, 1989. Upon arrival, it was noted that the stanchions and supports

---

[13]Hale Trial Exhibits 49 and 85 at 2.

for the fourth tier of the last row of mobile homes had started to bend, causing some of the mobile homes to shift and sustain minor damage. Jones testified that the damage to the mobile homes was caused by shifting due to the bolts not being properly tightened by the stevedores or caused while the stevedores were unloading the homes. SOGUCI'S insurance underwriters' surveyor, Christian Renaux, reported that the damage was caused by the improper modification of the stanchion system, a failure to properly tighten the connecting bolts, and inadequate bracing of the structure due to welding of stanchions on the deck instead of plates on the deck. Renaux advised that the deformed stanchions should be replaced, and the mobile homes should be transported on only three levels. One of SOGUCI's owners, Michael Porry, testified that five mobile homes were damaged as a result of the first voyage, and were repaired quickly. Jean-Pierre Porry, another SOGUCI owner, testified that he never objected to the transport of the mobile homes in four, rather than three, tiers.

A dispute arose between Houston and Hale concerning the amount of charter hire and other charges due arising from the first voyage.[14]

Based on the insistence of its insurers, SOGUCI notified Houston and Project Logistics that it would require a survey of the vessels before departure on the second voyage. Houston subsequently hired NCB as surveyor to assure that the mobile homes were properly secured prior to the sailing of the vessels.[15] NCB first viewed the barge when it was two-thirds loaded and

---

[14]Although Houston had paid the $100,000.00 due according to the Time Charter prior to the departure of the tug and barge from Baltimore, Maryland, and had transferred $150,000.00 to Hale three days after the commencement of the first voyage, no further amounts had been paid. Hale claimed it was owed $129,405.05 upon the completion of the first voyage, but Houston disputed the amount. The parties agreed to compromise for $99,605.58.

[15]Although NCB was initially asked to do a "trip and tow" survey as to the seaworthiness of the tug and the adequacy of the tug's towing gear, they declined to do so.

examined the tightness of the nuts and bolts and the securing of the lashing. NCB marine surveyor Arthur Evans Collins stated that, if the nuts and bolts were not tightened to the stanchion system, the system "would eventually work loose" causing possible damage to the mobile homes and bending to the system. NCB's surveyors examined the nuts, bolts, and lashing on the first tier physically, and on the other tiers visually. Their examination on the first tier revealed that some of the nuts and bolts were extremely loose. Their examination of the other tiers did not reveal whether or not the nuts were properly torqued, which would permit the nuts to back off the bolt. NCB's surveyors were not notified that the sailing of the barge was conditioned on the issuance of a trip and tow survey ordered by SOGUCI, and were not notified of Renaux's recommendations for the second voyage.

On November 13, 1989, Project Logistics advised Houston that the stevedores had completed the loading, lashing, and securing of the mobile homes on the barge. Houston then advised Project Logistics that some of the nuts and bolts were loose. However, later that day, after the crew had rectified the loose nuts and bolts, NCB issued its document stating that all of the mobile home cargo was properly secured. The NCB document was accepted by SOGUCI and the vessels were permitted to sail.

Houston was to receive payment from Project Logistics after the bill of lading was issued for the cargo. After the vessels sailed, Project Logistics refused to pay Houston the freight, demurrage and other charges due to it. On November 20, 1989, Houston required that SOGUCI make payment in the amount of $456,250.00. When SOGUCI did not pay, Houston instructed Hale

8

to return the tug and barge to the nearest U.S. port. Hale ignored Houston's instructions, unilaterally canceled the time charter, and entered into a separate agreement with Project Logistics.[16]

On November 25, 1989, while the mobile homes were under the care, custody, and control of Hale and/or Project Logistics en route to French Guyana, the mobile homes on the fourth tier of the last row shifted. At Hale's instruction, the captain took the barge into Martinique. The shifting of the stanchions caused one mobile home to drop down on the mobile home below it, and to puncture a small hole in the roof. There was no other movement or damage to the mobile homes in the other rows. As a result of a dispute between Hale and SOGUCI concerning the manner in which the mobile homes would be transported to French Guyana, SOGUCI instituted legal proceedings against the vessels in Martinique. The vessels were held under arrest in Martinique from December 8 until December 29, 1989. Fifteen mobile homes were off loaded and shipped to French Guyana on another vessel, and the vessels then sailed with the remaining mobile homes. The mobile homes arrived in French Guyana in January 1990, and were again inspected by Renaux. Renaux testified that all of the mobile homes sustained damage because the steel structures were loose and the stanchions were bent, and he observed many loose bolts after both voyages.

In February 1990, Hale filed this complaint in admiralty against Houston, seeking its unpaid charter hire, fuel and lube oil expenses, indemnification for any sums due to the cargo claimant from SOGUCI's pending action in Martinique, payment for the $70,895.38 of expenses incurred during the emergency call at Fort de France, Martinique, and for lost profits in the amount of $100,000.00.

---

[16]After the second voyage commenced, Hale advised Houston that it required payment of all sums due by November 16, 1989. Hale also advised Houston that if it failed to make timely payments, Hale intended to exercise its rights under the Time Charter and maritime law to withdraw the vessels from service and to lien subfreights.

It also sought indemnification for any sums due to the cargo claimant from the action pending in Martinique, damages for detention, loss of profit, port charges, pilotage, and stevedoring costs from Meridian, NCB, D & D Welding, and Fabricated Products. Houston counterclaimed against Hale for damages from Hale's breach of the charter agreement. NCB cross-claimed against Houston, Meridian, D & D Welding, and Fabricated Products for indemnification or contribution on the claims brought by Hale, and against Houston for breach of contract to recover its unpaid surveying fees. SOGUCI subsequently filed a complaint for $700,000.00 in damages to the shipment of mobile homes against Houston, NCB, London Offshore, Hale, and Project Logistics.[17]

The case proceeded to a non-jury trial.[18] Following the submission of post-trial briefs, the district court entered judgment for NCB, Hale, and the Alexandra Hale and Liberty Trader on SOGUCI's claims against them. It ruled against Hale on its claims against NCB and Houston for indemnity and contribution. It entered judgment for Hale against Houston on its charter party claim for $378,325.03 with interest, and "on each of Houston's claims against Hale." It entered judgment against NCB on its breach of contract claim against Houston. After Houston and SOGUCI submitted a stipulation as to the exchange rate, the district court granted judgment for SOGUCI on its claims against Houston for $337,049.52 with interest. Houston appealed, and SOGUCI

---

[17]By stipulation, SOGUCI's action against London Offshore was dismissed.

[18]Meridian was in Chapter 7 bankruptcy, and the case proceeded without its participation. Project logistics never entered an appearance and, based on the parties' tacit agreement that the case proceed to trial in the absence of Project Logistics, without any effort to default Project logistics, the district court found Project Logistics effectively dismissed. D & D Welding was dismissed as a party at the commencement of the trial, and summary judgment was granted against Hale on its claim against Fabricated Products. Hale and NCB's cross-claims against London Offshore were stricken, and NCB's cross-claims against Fabricated Products and D & D Welding were dismissed.

cross-appealed. Houston and SOGUCI timely filed appeals from the district court's judgment on all claims except SOGUCI's against Houston, our case no. 95-3201. After the district court entered judgment for SOGUCI against Houston, Houston and SOGUCI filed timely appeals, our case no. 95-3296.

## II. DISCUSSION

### A. "Carriers" under COGSA

Houston argues that the district court erred in finding that it was not a "carrier" or independent contractor of the carrier, Project Logistics, and thus entitled to the limitations under the Carriage of Goods by Sea Act ("COGSA").[19] SOGUCI maintains that the district court erred in finding the vessels, *in rem,* "carriers" under COGSA.

Under COGSA,[20] "the carrier in relation to the loading, handling, stowage, carriage, custody, care, and discharge" of goods by sea is subjected to certain duties and entitled to certain rights.[21] The statute defines a carrier as "the owner or charterer who enters into a contract of carriage with a shipper."[22] An owner may be a "carrier" either directly as the signor of a contract of carriage, indirectly by a charterer's authority to bind the owner by signing bills of lading as "for the master,"[23]

---

[19]46 U.S.C. § 1300 *et seq.*

[20]46 U.S.C. §§ 1300-1315.

[21]46 U.S.C. § 1302.

[22]46 U.S.C. § 1301(a).

[23]*Matter of Intercontinental Properties Management, S.A.,* 604 F.2d 254, 258 n. 3 (4th Cir.1979); *EAC Timberlane v. Pisces, Ltd.,* 745 F.2d 715, 719 (1st Cir.1984); *Pacific Employers Insurance Company v. M/V Gloria,* 767 F.2d 229, 235-236 (5th Cir.1985); *J. Gerber & Co., Inc. v. M/V Inagua Tania,* 828 F.Supp. 458, 460-461 (S.D.Tex.1992) (absent bills of lading showing contractual relationship between owner and shipper and evidence that the charterer had actual or apparent authority to bind the owner, owner is not a "carrier" subject to

or otherwise has some privity of contract with the shipper.[24]  A charterer may be a "carrier" as established by the vessel's charter, its acts of accepting and loading goods into containers owned by the charterer, and issuance of the bill of lading.[25]  More than one party may be a carrier, and where the owner has not completely relinquished possession, command and navigation of the ship to the charterer, both the owner and charterer may be held jointly liable.[26]  A vessel is a "carrier," and thus liable under COGSA, where (1) the ship transported and discharged the cargo;  (2) the bill of lading was issued "for the master;" (3) no contractual relationship existed which absolved the ship and its owner from liability for the cargo.[27]  The COGSA defenses and protections may be extended to the carrier's agents and contractors by an express provision, a "Himalaya clause," in the bill of lading.[28]

---

liability);  *Otto Wolff Handelsgesellschaft v. Sheridan Transportation Company,* 800 F.Supp. 1359, 1362-1363 (E.D.Va.1992).

[24]*EAC Timberlane,* 745 F.2d at 719.

[25]*Yeramex International v. S.S. Tendo,* 595 F.2d 943, 946-947 (4th Cir.1979);  *Demsey & Associates v. Steamship Sea Star,* 461 F.2d 1009, 1014 (2nd Cir.1972);  *Joo Seng Hong Kong Co., Ltd. v. S.S. Unibulkfir,* 483 F.Supp. 43, 45-47 (S.D.N.Y.1979);  *Trans-Amazonica Iquitos, S.A. v. Georgia S.S. Co.,* 335 F.Supp. 935, 937-938 (S.D.Ga.1971).

[26]*Trans-Amazonica Iquitos, S.A.,* 335 F.Supp. at 940-941 (S.D.Ga.1971);  *J. Gerber & Co.,* 828 F.Supp. at 460.

[27]*Industria Nacional Del Papel, CA. v. M/V "Albert F,",* 730 F.2d 622, 624 (11th Cir.), *cert. denied,* 469 U.S. 1037, 105 S.Ct. 515, 83 L.Ed.2d 404 (1984);  *Compagnie De Navigation Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corporation,* 316 F.2d 163, 172-173 (5th Cir.1963);  *Otto Wolff Handelsgesellschaft,* 800 F.Supp. at 1362-1363.

[28]*Certain Underwriters at Lloyds' v. Barber Blue Sea Line,* 675 F.2d 266, 269 (11th Cir.1982);  *Generali v. D'Amico,* 766 F.2d 485, 487-488 (11th Cir.1985);  *Taisho Marine & Fire Insurance Co., Ltd. v. Vessel "Gladiolus",* 762 F.2d 1364, 1367 (9th Cir.1985) (whether an entity is the intended beneficiary of a Himalaya clause is determined by the contractual relationship between the entity and the carrier, and the natures of services performed compared with the carrier's responsibilities);  *Agrico Chemical Company v. S/S Atlantic Forest,* 620 F.2d 487, 489 n. 1 (5th Cir.1980);  *Almacen Boyaca CIA, LTDA v. Gran Golfo Express,* 771 F.Supp. 354, 356 (S.D.Fla.1991);  *Agrico Chemical Co. v. SS Atlantic Forest,* 459 F.Supp. 638, 647

12

In considering the COGSA limitation of liability, this court construes Himalaya clauses strictly limiting their application to the intended beneficiaries.[29] The clause must express the understanding of the contracting parties through language expressing a clear intent to extend the benefits to a well-defined class of readily identifiable persons.[30] A reference to a class of persons such as "agents" and "independent contractors" clearly indicates that the contract includes all persons engaged by the carrier to perform the functions and duties of the carrier within the scope of the carriage contract, and no further clarity, such as enumeration of the parties, is necessary.[31] To determine whether a party is an independent contractor referenced in a Himalaya clause, a court should (1) compare the nature of the services provided by the party with the carrier's responsibilities under the bill of lading or contract of carriage,[32] and (2) consider whether the independent contractor's duty had been fulfilled at the time when the liability was incurred.[33] Further, a contractor will be entitled to the benefits of a Himalaya clause where there is a manifest consent by the carrier that the contractor shall act on its behalf and subject to its control, and consent by the contractor to so act.[34]

---

(E.D.La.1978)(carrier may not insulate itself from liability by use of independent contractors).

[29] *Certain Underwriters at Lloyds',* 675 F.2d at 268.

[30] *Id.* at 269-270.

[31] *Id.*

[32] *Taisho Marine & Fire Insurance Co.,* 762 F.2d at 1367.

[33] *Hiram Walker & Sons, Inc. v. Kirk Line,* 877 F.2d 1508, 1516 (11th Cir.1989).

[34] *Grace Line, Inc. v. Todd Shipyards Corporation,* 500 F.2d 361, 373 (9th Cir.1974).

As the district court noted, COGSA governed the carriage of the mobile homes from Tampa to French Guyana by virtue of clauses incorporated in the bills of lading. Each bill of lading contained a "Clause Paramount" which provided that COGSA applied to the carriage of the cargo, a "Clause 9" which provided that deck cargo shall be carried subject to COGSA's provisions, and a "Clause 19" which provided for a Himalaya clause extension of the rights provided to the carrier to agents, servants, and independent contractors of the carrier.

The district court found that the vessels, *in rem,* qualified as carriers under COGSA because they (1) transported and discharged the cargo of the mobile homes, and (2) the master of each voyage, by transporting the cargo, ratified the bills of lading. It found that Project Logistics was also a carrier as it signed both bills of lading, booked the cargo through its booking note with SOGUCI, hired the stevedores to load and discharge the cargo, received payment from the shipper, SOGUCI, and disbursed payment to other parties. However, it concluded that Houston was neither an agent nor independent contractor of Project Logistics. It noted that Houston was not directly employed by Project Logistics, did not receive payment for its services from Project Logistics, had no contractual relationship with Project Logistics, and was not rendered an agent by Project Logistics as Project Logistics did not consent to have Houston act on its behalf. Although the July 31, 1989 booking note listed "Meridian Ship/Houston Sea-Pack" as the carrier, the district court noted that Houston's representative, Don Jones, was neither a party to the contract nor signed the booking note.

The evidence supports the district court's finding that Houston was not a "carrier" entitled to COGSA benefits. Houston was neither an agent nor contractor of shipper Project Logistics. Houston was contacted by a representative of Meridian Shipping, Inc., and Houston and Meridian proposed a shipping plan to Project Logistics. The July 31, 1989, and August 4, 1989, Booking

14

Notes were executed, respectively, by representatives of Project Logistics and Meridian naming "Meridian Ship/Houston Sea-Pack" as the carrier and Project Logistics as the merchant, and by representatives of Project Logistics and Florida Mercury naming Project Logistics as the carrier. Neither Houston nor its representative were a party to the July 31, 1989 contract.

On August 28, 1989, representatives of Houston and Hale executed a Time Charter in which Hale chartered the vessels Alexandra Hale and Liberty Trader to Houston. On September 18, 1989, a representative of Project Logistics and Harry C. Anderson, Master of the M/V Alexandra Hale, executed a Bill of Lading listing SOGUCI as the shipper and consignee, and the Liberty Trader as the vessel. Meridian, as Houston's agent, executed a separate Bill of Lading for the first shipment of mobile homes.

On November 13, 1989, a representative of Project Logistics executed a Bill of Lading for the second shipment of mobile homes, listing SOGUCI as the shipper and consignee, and the vessel as Liberty Trader; Meridian, as Houston's agent, executed a Bill of Lading for the shipment of mobile homes. On November 16, 1989, Project Logistics' representative executed a corrected Bill of Lading for the second shipment of mobile homes, listing SOGUCI as the shipper and consignee, and Liberty Trader as the vessel. There was no evidence presented that showed that Project Logistics entered into a contract of carriage or bill of lading with Houston, consented to have Houston act on its behalf as an agent, or was in privity with Houston. Project Logistics signed both bills of lading, booked the cargo through its booking note with SOGUCI, hired the stevedores to load and discharge the cargo, received payment from the shipper, and disbursed the funds to other parties.

15

Houston claims that the district court failed to consider SOGUCI's stipulation that "Project Logistics contracted with Houston to design a stanchion support system to carry 110 mobile homes per voyage on the deck of the barge."[35] It also claims that the district court failed to consider that the provided tug, barge and stanchion system were fundamental to the performance of the contract for ocean carriage of the cargo from Tampa to Guyana, and that written agreements were entered into between Project Logistics and Houston, specifically the July 31, 1989 Liner Booking Note signed by representatives of "Meridian Ship/Houston Sea Pack" and Project Logistics stating that the carrier is "Meridian Ship/Houston Sea" and the merchant or shipper is Project Logistics; the August 4, 1989 communication from George Mandeville of Project Logistics to Don Jones of Houston indicating agreement of certain loading and support requirements to be provided by Houston; the August 7, 1989 communication from Don Jones of Houston agreeing to conditions set forth in Project Logistics' August 4 transmittal; and the August 8, 1989 agreement signed by representatives from Project Logistics, "Meridian Ship/Houston Sea Pack," and Houston Sea-Packing.

The evidence showed that Houston was originally contacted by Meridian concerning the methods and costs of transporting the mobile homes and the construction of a stanchion system. In July 1989, Meridian and Houston entered into a booking note with Project Logistics for the shipment of the mobile homes; this booking note showed Meridian Ship/Houston Sea Pack as the "carrier" or "owner" but indicated that the vessel was to be named later. However, the July 1989 booking note was replaced by the August 4, 1989 booking note which was signed by Project Logistics and Florida Mercury and which named the vessels.

---

[35]R2-104 at 2 ¶ 6; R2-99 at 3 ¶ A.

The September 18, 1989 bill of lading showed SOGUCI as the consignee or shipper, and was signed by a representative of the carrier, Project Logistics, and by the Master of the M/V Alexandra Hale, Harry C. Anderson. The November 13, 1989 bill of lading showed SOGUCI as the consignee or shipper, and was signed by a representative of the carrier, Project Logistics. Houston, however, did not issue either bill of lading. Houston, by virtue of the "Conlinebooking" Liner Booking Note it entered into with Project Logistics, was not responsible for the loading of the mobile homes onto the barge, securing and lashing the homes onto the stanchion system, or insuring that the nuts and bolts were securely fastened and tightened.

Houston argues that its carrier status was determined by the district court's finding that "pursuant to the time charter between Hale and Houston, the Master of the vessels signed the bills of lading on behalf of Houston, rather than Hale" or, alternatively, that by sailing the vessels with the mobile homes on board, Houston impliedly ratified the bills of lading. However, Houston mischaracterizes the district court's findings.

In considering the vessels' "carrier" status, the district court noted the qualifications for a vessel, *in rem,* to qualify as a carrier, and found that the vessels met those requirements because a "master's" sailing of the vessel with cargo aboard constitutes a ratification of the bill of lading. The district court made no findings as to Houston's implicit ratification of the bills of lading.

In considering Hale's "carrier" status, the district court found that:

[n]o Hale representative signed the November 13, 1989 bill of lading. Although Captain Anderson signed the September 18, 1989 bill of lading, he did so without actual or apparent authority to bind Hale as the vessels' owner. The time charter between Hale and Houston defined the respective duties of each party ... and provided that the captain would serve under the orders and directions of the charterer, Houston, with respect to employment and agency. The time charterer further provided that the charterer's agent would sign bills of lading in place of the captain. Captain Anderson, therefore, signed the bill of lading in

17

contravention of the time charter. Moreover, any authority conferred on Captain Anderson to sign the bills of lading flowed from Houston as a principal to the Captain as its agent....[36]

The district court did not find that the Master signed the bills of lading on behalf of Houston, but only that he did so without actual or apparent authority, and any of his authority would have flowed from Houston under the time charter. Similarly, as the district court noted in denying Hale's "carrier" status claim, Houston neither booked the cargo nor hired stevedores to load the cargo on the vessel, and did not receive any payment directly from the shipper, SOGUCI.

The district court's conclusions that the vessels *in rem* were carriers and that Houston was not a carrier are correct.

B. Liability under COGSA

SOGUCI maintains that the district court erred in finding that the vessels were entitled to the $500 per package limitation of liability under COGSA. It contends that the district court improperly found that the vessel's captain exercised due diligence in loading and stowing the cargo on the second voyage, and that the vessels were not liable for the costs of discharging and transhipping the fifteen mobile homes off-loaded in Martinique. It maintains that the vessels were not entitled to the COGSA limitation on liability because they did not give SOGUCI an opportunity to declare a higher value per package.

Under COGSA, a shipper establishes a prima facie case by proving that the carrier received the cargo in good condition, but unloaded it in damaged condition at its destination.[37] Once the

---

[36]R2-257 at 22.

[37]*Sony Magnetic Products Inc. of America v. Merivienti O/Y,* 863 F.2d 1537, 1539 (11th Cir.1989); *M. Golodetz Export Corp. v. S/S Lake Anja,* 751 F.2d 1103, 1109 (2nd Cir.), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2361, 86 L.Ed.2d 261 (1985) (the shipper is not required to prove that the carrier was at fault or how the damage might have occurred); *Westinghouse*

18

shipper presents a prima facie case, the burden shifts to the carrier to prove that it either exercised due diligence to prevent damage to the cargo by handling, stowing, and carrying the cargo in a seaworthy ship, or that the harm resulted from an "uncontrollable" cause of loss as statutorily defined.[38] The determination of whether due diligence and proximate cause are matters of fact, and this court will not overturn the district court's findings on these issues absent a finding that the findings are clearly erroneous.[39] This court may not reverse the district court's findings on the evidence if they are plausible in light of the record viewed in its entirety, even if we would have weighed the evidence differently and arrived at a contrary conclusion.[40] Independent surveyor reports and testing can be considered as "very strong evidence of due diligence."[41]

The duty to load, stow, and discharge cargo in the carriage of goods under a time charter is on the ship and its owner.[42] Use of stevedores to load and discharge the cargo does not relieve the

---

*Electric Corporation v. M/V "Leslie Lykes",* 734 F.2d 199, 206 (5th Cir.), *cert. denied,* 469 U.S. 1077, 105 S.Ct. 577, 83 L.Ed.2d 516 (1984);  *Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1227 (11th Cir.1983);  *Blasser Brothers, Inc. v. Northern Pan-American Line,* 628 F.2d 376, 381 (5th Cir.1980).

[38]*Sony Magnetic Products Inc. of America,* 863 F.2d at 1539;  *Westinghouse Electric Corp.,* 734 F.2d at 206;  *Terman Foods, Inc.,* 707 F.2d. at 1227;  *Blasser Brothers, Inc. v. Northern Pan-American Line,* 628 F.2d at 382-383;  46 U.S.C. § 1304(2).

[39]*Fireman's Fund Insurance Companies v. M/V Vignes,* 794 F.2d 1552, 1555 (11th Cir.1986).

[40]*Id.*

[41]*Id.* at 1556.

[42]*Associated Metals & Minerals Corp. v. M/V Arktis Sky,* 978 F.2d 47, 50 (2nd Cir.1992);  *United States v. Lykes Bros. S.S. Co., Inc.,* 511 F.2d 218, 224 (5th Cir.1975);  *Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 330 (2nd Cir.1972);  *Demsey & Associates, Inc.,* 461 F.2d at 1014 (operation under a charter does not affect the liability of the vessel);  *Agrico Chemical Company,* 459 F.Supp. 638, 647 (E.D.La.1978), *aff'd,* 620 F.2d 487, 489 (5th Cir.1980)(a carrier may not insulate itself from liability by use of independent contractors, servants, or agents).

ship and her owner of responsibility for any consequent cargo damage.[43]  However, a shipper may contract with another party to exercise control over the loading and unloading of the cargo, and liability will be found by determining who controlled the loading and storage.[44]

The doctrine of deviation provides that, when a ship deviates from the contract of carriage or varies the conduct in the carriage of goods, increasing the risk of shipment of the goods, COGSA does not apply because the bill of lading, which acts as the contract of carriage, is nullified.[45]  The doctrine of deviation has been applied sparingly for geographical departures and unauthorized on-deck stowage.[46]  Where a ship leaves port badly stowed or unseaworthy, courts have held that the ship did not deviate in seeking a port of refuge.[47]  Also, a ship's master is empowered to exercise his good faith judgment during his command where the safety of the crew, vessel and cargo are concerned.[48]

---

[43]*Id.*.

[44]*Sumitomo Corporation of America v. M/V "Sie Kim",* 632 F.Supp. 824, 836-837 (S.D.N.Y.1985).

[45]*Unimac Co., Inc. v. C.F. Ocean Service, Inc.,* 43 F.3d 1434, 1437 (11th Cir.1995);  *Spartus Corporation v. S/S Yafo,* 590 F.2d 1310, 1313-1314 (5th Cir.1979), quoting *G.W. Sheldon & Co. v. Hamburg Amerikanische Packetfahrt-Actien-Gesellschaft,* 28 F.2d 249, 251 (3rd Cir.1928)(a deviation may include "carrying the cargo on the deck of the ship contrary to custom and without the consent of the shipper" or "failure to deliver the goods at the port named in the bill of lading").

[46]*Unimac Co., Inc.,* 43 F.3d at 1437.

[47]*The Malcolm Baxter, Jr.,* 20 F.2d 304, 305-306 (2nd Cir.1927), *aff'd,* 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901 (1928) (distinguishing between a voluntary and involuntary deviation, and noting that there is no deviation where a ship's master seeks a port of refuge for the safety and best interest of the crew, ship or cargo after finding that a ship is unseaworthy from the "unfitness of the structure.").

[48]*Westinghouse Electric Corp.,* 734 F.2d at 215-216.

Under COGSA,[49] the shipper has the burden of declaring the value of its goods and paying a higher freight if it wants to have greater liability placed on the carrier.[50] Where the carrier demonstrates that the shipper was given a fair opportunity to declare a higher value on paying a higher freight by being offered a choice of rates and valuations, the burden shifts to the shipper to demonstrate that a fair opportunity did not exist.[51] The $500 per package limitation applies to on-deck shipments where it is plain on the face of the bill of lading that the cargo is to be carried on-deck and that COGSA is to be applied.[52]

The district court found that Hale was not liable for the discharging and transhipment of the off-loaded mobile homes in Martinique because it exercised due diligence "to ensure seaworthiness of the vessel with respect to the stanchion system." It noted that, although the vessel's captain "had reason to know of a potential deficiency in the design of the stanchion system prior to the second voyage," he was reassured by Houston that the stanchion system was safe, and "properly deferred to the judgment of the engineer who designed the system and the surveyors who certified the suitability of the system." It noted that the captain was not present during the repairs, and the time charter placed full responsibility for the system in Houston's care.

---

[49]46 U.S.C. § 1304(5).

[50]*Sony Magnetic Products of America v. Merivienti O/Y,* 668 F.Supp. 1505, 1512 (S.D.Ala.1987), *aff'd* 863 F.2d 1537 (11th Cir.1989); *Caterpillar Americas Company v. S.S. Sea Roads,* 231 F.Supp. 647, 648 (S.D.Fla.1964), *aff'd,* 364 F.2d 829 (5th Cir.1966).

[51]*Insurance Company of North America v. M/V Ocean Lynx,* 901 F.2d 934, 939 (11th Cir.1990), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991); *Couthino, Caro and Co., Inc. v. M/V Sava,* 849 F.2d 166, 170-171 (5th Cir.1988).

[52]*Brown & Root, Inc. v. M/V Peisander,* 648 F.2d 415, 420-421 (5th Cir. Unit A 1981); *Z.K. Marine, Inc. v. M/V Archigetis,* 808 F.Supp. 1561, 1566-1567 (S.D.Fla.1992).

The district court's finding as to due diligence is not clearly erroneous.  Under the time charter, Houston, as charterer, assumed full responsibility for the stanchion system.  Houston hired a surveyor, as required by SOGUCI, to assure that the mobile homes were properly secured prior to the sailing of the vessels, and the surveyor inspected the system, and issued a document stating that all of the mobile home cargo was properly secured.  SOGUCI accepted the surveyor's document and permitted the vessel to sail.  The captain was not informed of the surveyor's apprehension of inadequacies of the stanchion system.  The evidence showed that the captain reasonably relied on the surveyor, and the engineer responsible for the repairs of the stanchion system.

The district court also found that, when the vessels sought a port of refuge at Fort de France, Martinique, it was necessary to remove fifteen mobile homes from the barge in order to safely continue the second voyage.  The decision to remove the mobile homes was made by SOGUCI's insurance underwriters' surveyor, Christian Renaux.  The vessel's captain agreed with the decision to remove the fifteen mobile homes and indicated that he would not continue the voyage until the mobile homes could safely make it to French Guyana.  After removal, the fifteen mobile homes were transhipped on another vessel to French Guyana.  The district court found that "any loosening of bolts on the second voyage" was attributable only to the extreme strain placed on the system by the improper design of the stanchion system.

Although the offloading of the mobile homes in Fort of France may have been a change in the time charter, it was not a "deviation."  The vessel's captain was empowered to exercise his good faith judgment where the safety of the cargo was involved, and in reliance on the opinion of SOGUCI's surveyor.  The vessels were not, therefore, liable for the costs of discharging and transhipping the fifteen mobile homes off-loaded in Martinique.

22

As the vessels, *in rem,* were not liable and the issue was not decided by the district court, this court will not consider the application of the COGSA per package limitation.[53]

C. Non-COGSA Liability

1. Hale's claim for charter hire against Houston

Houston argues that the district court erred in finding it liable to Hale for charter hire incurred subsequent to the cancellation of the charter party agreement because Hale unilaterally canceled the agreement.

The district court noted that, following a dispute with Houston regarding payment, Hale withdrew the vessels from charter hire on November 22, 1989. The court commented that Houston owed Hale $99,606.08 in charter hire from the first voyage, and $150,000.00 advance charter hire for the second voyage. It noted that the time charter permitted Hale to terminate the agreement if Houston failed to make payment, required Houston to surrender possession of the vessels upon termination, and provided that Houston would remain liable for sums due under the charter hire despite the termination.[54] The district court also found that Houston was obligated for charter hire until discharge of the cargo.

As long as a vessel remains under control of the charterer, mere notice of withdrawal to the time charterer is not enough to effectuate a withdrawal of the charter, and the time charter remains in effect until the cargo is discharged.[55] However, where a withdrawal is made during the term of

---

[53]However, this court notes that "it is plain on the face" of the September 1989 bill of lading, that the "cargo is loaded on deck" and that COGSA is to be applied. *See Brown & Root, Inc.,* 648 F.2d at 420-421.

[54]Although the district court refers to Paragraph 7, the default clause is found at Paragraph 4.

[55]*Schirmer Stevedoring Co., Ltd. v. Seaboard Stevedoring Corp.,* 306 F.2d 188, 193 (9th Cir.1962).

23

the charter, and the owners immediately make a new charter with a new voyage charterer, the withdrawal may be effective although the vessel has not been unloaded.[56] Generally, the obligation to carry and care for the goods remains on the carrier until the goods are actually delivered by being discharged at the port of discharge at the shore or alongside of a vessel.[57] The measure for lost income of a vessel by its owner for a vessel under charter hire is the contract rate for the vessel under the time charter.[58]

Houston was liable for charter hire incurred subsequent to the cancellation of the charter party agreement because, under the terms of the time charter, Houston remained liable, after termination, for any sums due at the time of the termination, and for charter hire until discharge of the cargo. Further, under the charter agreement, Houston was responsible for all consequences arising from the stanchion system. The district court did not err in finding Houston liable, or in calculating the loss of the use of the vessel.

2. NCB's liability to SOGUCI

SOGUCI maintains that the district court erred in not finding NCB's negligence in examining the bolting of the stanchion system causation for damages to the mobile homes. It contends that the

---

[56]*Id.*

[57]*Surrendra (Overseas) Private, Ltd. v. S.S. Hellenic Hero,* 213 F.Supp. 97, 101 (S.D.N.Y.), *aff'd,* 324 F.2d 955 (2nd Cir.1963); *Cardinal Shipping Corporation v. M/S Seisho Maru,* 744 F.2d 461, 468 (5th Cir.1984), quoting *Luckenbach v. Pierson,* 229 F. 130, 132 (2nd Cir.1915), and citing *Diana Compania Maritime, S.A. v. Subfreights of the S.S. Admiralty Flyer,* 280 F.Supp. 607, 612 (S.D.N.Y.1968), 2B *Benedict on Admiralty* § 6, at 53 (7th ed.1983); and *W. Poor, American Law of on Charter Parties and Ocean Bills of Lading* § 8, at 38 (1968); *Rainbow Navigation, Inc. v. United States,* 742 F.Supp. 171, 183 (D.N.J.1990), *aff'd,* 937 F.2d 105 (3rd Cir.1991); *Finora Co., Inc. v. Amitie Shipping, Ltd.,* 852 F.Supp. 1298, 1307 (D.S.C.1994), *aff'd,* 54 F.3d 209 (1995).

[58]*Delta S.S. Lines, Inc. v. Avondale Shipyards, Inc.,* 747 F.2d 995, 1009 (5th Cir.1984).

district court's reasoning was speculative, and contrary to the evidence. It also contends that the district court erred in not finding that NCB negligently misrepresented the seaworthiness of the barge, and failed to disclose the barge's unseaworthiness.[59] It argues that NCB was aware that SOGUCI was relying on NCB to ensure the seaworthiness of the tug and barge, and misled SOGUCI by issuing a letter making no mention of its observation that the stanchion system was in danger of failing.

The district court's determination of negligence is a finding of fact that will not be disturbed unless clearly erroneous.[60] In performing a survey of a vessel, a marine surveyor must use due care in making its recommendations and detecting all perceptible defects and must notify the owner of any defects.[61]

In order to state a claim for negligent misrepresentation, a plaintiff must allege that: (1) the defendant, in the course of its profession, supplied false information to the plaintiff for a business transaction; (2) the defendant failed to exercise reasonable care in gathering the information; (3) the plaintiff relied on the information for the transaction that was intended by the defendant; and

---

[59]Despite NCB's argument to the contrary, this issue was raised in and addressed by the district court.

[60]*Verrett v. McDonough Marine Service,* 705 F.2d 1437, 1441 (5th Cir.1983).

[61]*Dillingham Tug & Barge Corporation v. Collier Carbon & Chemical Corporation,* 548 F.Supp. 691, 698 (N.D.Ca.1981), *aff'd* in part and *rev'd on other grounds,* 707 F.2d 1086 (9th Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

(4) the plaintiff suffered a resulting pecuniary loss.[62]  A party's access to information and the failure

to inquire precludes, as a matter of law, claims of reliance on misrepresentations.[63]

As to the causation issue, the court found that:

> On the second voyage, the stanchions bent again due to the improper placement of a fourth tier on the system.... SOGUCI assert(s) that failed bolt connections in the system also caused its collapse.  Various witnesses testified that just prior to the second voyage, stevedores climbed to all tiers of the system to ensure all bolts were tightened.  Don Jones testified that pursuant to his request, Project Logistics had their stevedores undertake this activity. NCB confirmed in its physical and visual inspection that the stevedores adequately secured the bolts in the system.  The Court finds that any loosening of bolts on the second voyage can be attributed only to the extreme strain placed on the system by the improper design of the fourth tier in conjunction with the pitching at sea.[64]

> \* \* \* \* \* \*

> Although NCB fully inspected the bolting on the first tier of the system, it failed to properly examine the bolting on upper tiers of the system.  NCB could not have fully assessed the proper tightening of bolts on the upper tiers by visual inspection, as it was difficult to view the bolts from the ground.  Additionally, it appears that NCB's surveyors made very little effort to obtain a ladder or to utilize other means to physically examine the bolting on the upper tiers.  Nevertheless, NCB's negligence in examining these bolts on the upper tiers had no causal relationship to the cargo damage.  The Court has concluded that the bolts on all tiers were adequately tightened prior to departure of the second voyage and that the failure of the stanchion system and damage to the cargo did not result from loose bolting of the system prior to the second voyage.  NCB's failure to examine the bolts did not, therefore, contribute to the failure of the stanchion system.[65]

---

[62]*Coastal (Bermuda) Ltd. v. E.W. Saybolt & Co., Inc.,* 826 F.2d 424, 428-429 (5th Cir.1987), *reh'g denied,* citing *Grass v. Credito Mexicano, S.A.,* 797 F.2d 220 (5th Cir.1986), *cert. denied,* 480 U.S. 934, 107 S.Ct. 1575, 94 L.Ed.2d 766 (1987) for the requirements to state a cause of action for negligent misrepresentation under *Restatement (Second) of Torts* § 552 (1977).

[63]*Grumman Allied Industries, Inc. v. Rohr Industries, Inc.,* 748 F.2d 729, 737-738 (2nd Cir.1984).

[64]R2-257 at 18.

[65]R6-257 at 33.

The district court's conclusion that any failure to inspect was not casually related to the damage to the mobile homes does not appear clearly erroneous. There was testimony that the bolts were tightened prior to the voyage after NCB inspection revealed that some of the nuts and bolts on the first tier were extremely loose, and that any loosening of the bolts during the voyage was due to the improper design of the system, and the pitching of the sea. Renaux explained that the damage resulted from "the lack of rigidity from the whole structure,"[66] and, due to the damage incurred on the first voyage, he had advised replacing "all the deformed stanchions to consolidate the lashing and to carry, to transport the mobile homes on three levels only."[67] Although Renaux answered "I suppose so" when asked whether the bolts were loose because they weren't properly tightened when the barge was in Tampa,[68] and "I think so, yes," when asked whether "had the bolts been properly tightened in Tampa they would not have come loose,"[69] and testified that the mobile homes "sustained damage ... because the structures were loose, got loose,"[70] his answers were in response to questions about his thoughts during his inspection of the cargo in Martinique.

As to negligent misrepresentation, the district court found that NCB could not "be held liable for a failure to conduct a full trip and tow survey," because NCB had no duty to Houston, SOGUCI, or any other party to perform a trip and tow survey or to detect and report defects which such a survey would have encompassed. It reasoned that NCB entered into the agreement to perform the

---

[66]R10 at 42, 67-69, 74, 87-89, 91; Renaux deposition at 106-107.

[67]*Id.* at 29, 138.

[68]Renaux deposition at 111.

[69]*Id.*

[70]*Id.* at 107.

27

survey with Houston, and conducted the survey according to Houston's instructions. It noted that, although Houston had initially requested a trip and tow survey, Houston acquiesced to a different type of survey when NCB informed Houston that it would be unable to perform a full trip and tow survey.

The district court's conclusion is not clearly erroneous. NCB was hired by Houston, albeit at SOGUCI's insurers' insistence that a survey would be required before departure of the second voyage, to "assure that the mobile homes were properly secured."[71]  Although NCB was initially asked by Houston to perform a trip and tow survey, addressing the seaworthiness of the tug and its ability to safely carry the cargo to its destination, NCB declined to perform a trip and tow survey. Further, Houston advised NCB's surveyor that the stanchion system was none of his concern, and not to worry about it. NCB was not notified that the sailing of the barge was conditioned on the issuance of a trip and tow survey.

The November 13, 1989 letter issued by NCB states:

> This will confirm that the National Cargo Bureau, Inc., performed a final inspection of the cargo loaded on the Barge Liberty Trader on November 13, 1989. We sighted the stowage and securing of cargo, specifically noting that the frames of houses/mobile homes were properly secured to the network of framed bays ... The frames comprising the bays were also noted to be secured to one another. The cargo of mobile homes was stowed three high throughout except the aftermost thwartship row was stowed four high. In our opinion, all cargo, including the row stowed four high, was adequately secured with respect to frames of mobile homes being secured to frames in bays.[72]

The letter made no reference to the seaworthiness of the barge or the stanchion system, and clearly indicated that some of the mobile homes were being transported on a fourth level. After the

---

[71]R8 at 71.

[72]Hale trial exh. 2 at 8.

first voyage, SOGUCI had been advised by its own surveyor that the mobile homes should be transported on only three levels, and a representative of SOGUCI was present for both the loading of the barge and the issuance of NCB's letter. SOGUCI, therefore, had access to information of the defect in the stanchion system design, and could not rely on NCB's failure to address such in its letter.

D. Calculations of Loss of Rental Income

SOGUCI claims that the district court erred in finding that SOGUCI had failed to mitigate damages by repairing the mobile homes, and committed a clerical error in the calculation of its loss of rental income.[73] It maintains it made the repairs as quickly as possible, and that the six-month delay was due to the unavailability of replacement parts, materials, and repair facilities in French Guyana. It states that the district court erroneously calculated the lost rental income using 375 francs per month as the loss of rental income for each mobile home, although the undisputed testimony was that the rent for each mobile home was 6,375 francs. It suggests that this miscalculation was a clerical error in the calculation of the judgment, or was unsupported by the record. As to the miscalculation, Hale responds that the matter should be remanded as the district court's intention is not clear.

---

[73]Although SOGUCI states that it filed a Fed.R.Civ.P. 60(a) motion for correction of the clerical error with this court, the clerk of this court returned that motion to SOGUCI in March 1996, with instructions that the motion be filed in the district court pursuant to *Lairsey v. Advance Abrasives Company,* 542 F.2d 928 (5th Cir.1976) (if the district court is inclined to grant the motion, it should certify such to this court so that the movant can request remand from this court). By telephone, SOGUCI's counsel advises that the motion was filed with the district court on January 8, 1998. On March 2, 1998, the district court denied the motion without prejudice. It noted that it was without authority to correct the alleged clerical error absent leave of this court.

This court reviews a district court's finding of fact for clear error, and will not reverse unless, after "making all credibility choices in the fact-finder's choice" and reviewing the record as a whole, it is clear that a mistake has been made.[74] If the district court's finding is plausible in light of the entire record, this court will not reverse "even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."[75] Under general maritime law, damages for lost profits against a tortfeasor are allowed only when the amount of such profits is proven with reasonable certainty.[76] In order to apportion damages based on a theory of failure to mitigate, the movant must establish that the failure to mitigate was unreasonable under the circumstances and aggravated the harm.[77] In determining whether a victim's conduct was reasonable, a court must consider that "the necessity for decision-making was thrust upon him by the defendant, and judgments made at times of crisis are subject to human error," and should "allow the injured party a wide latitude in determining how best to deal with the situation."[78]

---

[74]*Hiram Walker & Sons, Inc. v. Kirk Line,* 30 F.3d 1370, 1374 (11th Cir.1994), *cert. denied,* 514 U.S. 1018, 115 S.Ct. 1362, 131 L.Ed.2d 219, quoting *Meek v. Metropolitan Dade County,* 985 F.2d 1471, 1481 (11th Cir.1993); *Verrett v. McDonough Marine Service,* 705 F.2d 1437, 1441 (5th Cir.1983).

[75]*Hiram Walker & Sons, Inc.,* 30 F.3d at 1374, quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Pacific Employers Insurance Company v. M/V Gloria,* 767 F.2d 229, 235 (5th Cir.1985).

[76]*Domar Ocean Transportation, Ltd. v. Independent Refining Company,* 783 F.2d 1185, 1191-1192 (5th Cir.1986), citing *Bolivar County Gravel Company v. Thomas Marine Co.,* 585 F.2d 1306, 1308 n. 2 (5th Cir.1978).

[77]*Bosnor, S.A. de C.V. v. Tug L.A. BARRIOS,* 796 F.2d 776, 783 (5th Cir.), *reh'g denied,* 803 F.2d 717 (1986), citing *Tennessee Valley Sand & Gravel Co. v. M/V Delta,* 598 F.2d 930, 933 (5th Cir.1979).

[78]*Tennessee Valley Sand & Gravel Co.,* 598 F.2d at 933.

A district court may correct clerical mistakes in judgments based on oversight or omission at any time on its own initiative or on motion of any party,[79] in order to correct mistakes that were not intended.[80] A damages award that is incorrect because it is based on an erroneous mathematical computation that does not involve the substantive rights of the parties may be corrected under Rule 60(a).[81]

The district court noted that SOGUCI had asserted that it had contracted to rent the mobile homes commencing January 1, 1990, at the rate of 375 francs per month.[82] It found that SOGUCI's loss of rental income for the mobile homes while the mobile homes were being repaired was "a foreseeable damage resulting from Houston's negligence."[83] It found that SOGUCI "acted promptly in making repairs to the homes during January and February of 1990," but did not have the remaining repairs made until August 1990.[84] The district court concluded that SOGUCI had failed to mitigate damages by making repairs and facilitating the rental of these mobile homes at an earlier date, and allowed lost rental income for January and February, but denied lost rental income from March to September.[85]

---

[79]Fed.R.Civ.P. 60(a).

[80]*Allied Materials Corporation v. Superior Products Company, Inc.,* 620 F.2d 224, 225-226 (10th Cir.1980).

[81]*Matter of West Texas Marketing Corp.,* 12 F.3d 497, 502-505 (5th Cir.1994).

[82]R2-257 at 37. The judgment was subsequently calculated in U.S. dollars based on the 375 franc rent. R2-262 at 2.

[83]*Id.*. R2-257 at 37.

[84]*Id.* at 37-38.

[85]*Id.* at 38.

Both testimony and documentary evidence showed that each of the mobile homes were to be rented for 6,375 francs per month. The district court made no factual findings reducing the rent. Therefore, this matter is remanded to the district court for correction pursuant to Rule 60(a).

Mark Richard Bushey, a mobile home repairman from Florida, was employed by the manufacturer of the mobile homes to make the repairs on the damaged mobile homes in French Guyana. Bushey was contacted in December 1989, and went to French Guyana in February 1990. Although the materials that the mobile home manufacturer's representative had indicated would be needed for the repairs were shipped to French Guyana, once Bushey arrived in French Guyana, he realized that more materials were needed, specifically sheet metal corners and toilet parts, and ordered the additional parts. He repaired most of the first 105 damaged mobile homes by using all of the available materials, and left about ten to fifteen mobile homes needing repairs. Bushey said that he was available to return to French Guyana at any time, but was not called to return until August or September. When he returned, there were about 50 mobile homes in need of repair.

Mobile home representative Charles Aylor testified that it took about five months to get the necessary repair materials for the second trip to French Guyana, because the materials were shipped from Florida in April or May, and did not arrive in French Guyana until July or August.[86] He explained that the shipping delay was due to a strike, problems with the shipping company, and the need for a boat to take the materials from Surinam to French Guyana. He said that, although a couple of packages were sent by air, the bulk of the other materials made it very expensive to send

---

[86]Aylor did not explain why the materials which were ordered in February were not shipped until April or May.

them by air. When asked whether the repairs were done "as quickly and as efficiently as possible" based on the need to get the materials to French Guyana, and the shipping problems, Aylor replied:

> Using the transportation methods that were there, they were done as quickly as possible. We could have gotten Air France to fly in a plane or something like that done quicker, obviously. But there wasn't any delay because of money or anything of that nature that kept us from meeting the time schedules.[87]

Houston had the burden of showing that SOGUCI acted unreasonably in mitigating its damages. Although the district court noted that SOGUCI did not have the repairman return to make the repairs until August 1990, it is not clear that the district court considered the evidence explaining that this delay was due to problems in shipping the needed materials to French Guyana. The district court's denial of lost rental income from March to September 1990, is vacated, and the matter is remanded for consideration of the reasonableness of SOGUCI's conduct.

### III. CONCLUSION

The district court's findings of fact and conclusions of law are AFFIRMED on all issues, other than SOGUCI's loss of rental income and the calculation of that rental income. As to those issues, the district court's findings are VACATED and the matter is REMANDED for further consideration consistent with this opinion.

AFFIRMED IN PART and VACATED AND REMANDED IN PART.

---

[87]Aylor deposition at 145.