Almacen EL JORDAN, individually and for the use and benefit of New York Marine & General Insurance Company, Plaintiffs,

v.

SOLYMAR, S. DE R.L., Solymar International, and Solymar, Inc., Defendants.

No. 02–61113CIV.

United States District Court, S.D. Florida, Miami Division.

April 15, 2004.

Thomas Albert Boyd, Jr., Sullivan & Company, Jacksonville, G.J. Rod Sullivan, Jr., Department of Education, Tallahassee, FL, for Almacen El Jordan, individually and for the use and benefit of New York Marine & General Insurance Company, plaintiff.

Robert Dewitt McIntosh, Rachel Mendes Coe, Adorno & Yoss, Fort Lauderdale, FL, for Solymar, S. De R.L., defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ALTONAGA, District Judge.

THIS CAUSE came before the Court for trial starting on January 12, 2004. Based upon a careful consideration of the testimony and documentary evidence presented, the parties' pre-trial and post-trial briefs and submissions, including the documents presented by Defendant, Solymar S. De R.L. (hereinafter "Solymar") in the Notice of Filing Public Records on January 27, 2004 (**D.E. 98 & 100**), over Plaintiffs' objection, and being otherwise fully advised, the Count enters the following findings of fact and conclusions of law.

### Procedural Background

Plaintiffs, Almacen El Jordan (hereinafter "El Jordan"), for the use and benefit of New York Marine & General Insurance Company (hereinafter "New York Marine") (collectively "Plaintiffs"), originally sued Defendant, Solymar, seeking damages as a result of the failure of Solymar to deliver cargo in good condition in accordance with the provisions of a bill of lading, following shipment from Port Everglades, Florida, to San Pedro Sula, Honduras. In its Answer, Solymar did not advise El Jordan that it was not the carrier, and that El Jordan had therefore sued the wrong party. Several months after suit was filed, Solymar's counsel advised the Plaintiffs that Solymar was not the carrier, and that the proper defendant

was an entity known as "Solymar, Inc." (hereinafter "S. Inc"). Furthermore, Solymar's corporate representative produced for deposition, testified that the carrier of the goods was an entity known as "Solymar International" (hereinafter "S. International").

Plaintiffs sought and were granted leave to amend the complaint in order to add these two additional defendants, given their uncertainty as to whether Solymar was the carrier or if the carrier of the goods was S. Inc. or S. International. The Amended Complaint, filed on July 25, 2003, alleged three distinct, but identical, causes of action for breach of contract (bill of lading) against these defendants, seeking compensation for the damaged cargo (D.E.46). By the time trial commenced, Plaintiffs had abandoned their claims against S. Inc. and S. International (Counts II and III), being convinced that they had sued the proper party all along. Count I of the Amended Complaint is the claim brought against Solymar, the only claim tried before the Court. Solymar filed an Answer to Count I on January 5, 2004 (D.E.86). In its Answer, Solymar stated that it was not a party to the bill of lading in question, and therefore denied any liability for Plaintiffs' alleged damages.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333. This is an admiralty and maritime matter within the meaning of Rule 9(h), Fed. R. Civ. P. .

## FINDINGS OF FACT

### The Shipment Sued Upon

El Jordan is a Honduran retailer and wholesaler of consumer electronics. New York Marine is El Jordan's subrogated cargo insurer. The evidence presented at trial revealed that on or about August 10, 2001, El Jordan ordered a shipment of electronic articles, which included televi-sion sets and stereo systems, from a company known as S & A Distributors of Miami, Inc. (hereinafter "S & A"). S & A, in turn, retained Mondial Forwarders, Inc. (hereinafter "Mondial"), to arrange for the shipment of goods from Port Everglades, Florida, to San Pedro Sula, Honduras.

Joaquin Armengol, Sr., president of Mondial, called the offices of Solymar in Florida, and obtained a quote for transporting the electronic equipment, house-to-house from Miami to Honduras. He then booked the shipment with Solymar and arranged for Solymar to deliver an empty 45-foot shipping container to S & A and to issue a single bill of lading for the shipment. This is because, as part of the contract of shipment, Solymar supplied the ocean shipping container. S & A loaded the goods on a container provided by Solymar, and delivered them to Solymar in "perfect condition." S & A took photographs of the goods on August 9, 2001, as they were being loaded onto the container and just prior to the sealing of the container. The loaded container was sealed and then picked up by a trucking company named Soltrans who transported it to St. John's Shipping Company, Inc. in Port Everglades, Florida for loading aboard the *M/V Delphinus*.

The container number was "SCZU–145987–1." This was the same container Solymar loaded on its vessel, the *M/V Delphinus*, for which bill of lading number "SPS010802" was issued on August 11, 2001. That bill of lading, with number SPS010802, on its face bears the name "Solymar," with no indication of an "Inc.," "International," or "S.De R.L." The signature block for "Solymar" fails to designate whether the person signing it is signing for "Inc.," "International," or "S.De R.L." Therefore, the front side of the bill of lading provides little guidance concerning the identity of the carrier, other than that

the carrier has the word "Solymar" in its name. It is on the reverse side of the bill of lading that the name S. Inc. appears.

The parties presented no evidence to establish that either Solymar or S. International is S. Inc. The bill of lading does not identify whether it was issued by Solymar or S. International. The bill of lading identifies the shipper as S & A and the consignee as El Jordan in El Progreso, Yoro, Honduras. The bill of lading indicates that it is "dated at" August 11, 2001, and that the vessel carrying the container from Port Everglades to Puerto Cortes was the *M/V Delphinus*.

Specifically, the bill of lading describes the goods as: "1 45' [foot] HC. HOUSE TO HOUSE CONTAINER[1] SAID TO CONTAIN: 677 PKGS. ELECTRICAL ARTICLES (ARTICULOS ELECTRICOS Y MERCADERIAS VARIAS) [Electrical articles (televisions and stereos) and various merchandise]." On the back of the short form bill of lading are terms and conditions of custody and carriage of the goods that specify that the bill of lading "shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States...." The shipper did not declare the value of the goods on the face of the bill of lading. The line on the bill of lading for the shipper's declared value, which appears next to the statement that "[i]f shipper enters a value, carriers' 'package' limitation of liability does not apply and the ad valorem rates will be charged," was left blank. The Atlantic Maritime Agency (hereinafter "Atlantic"), was responsible for signing and issuing bills of lading as an agent for Solymar at the time bill of lading number SPS01082 was issued.

After the shipment was placed aboard the *M/V Delphinus*, a messenger picked up the bill of lading at the Solymar offices in Miami. Solymar billed Mondial $1,750.00 for ocean freight, $160.00 for local trucking and $95.00 for inland delivery in Honduras for a total of $2,005.00. On or about August 13, 2001, Mondial invoiced El Jordan $2,904.00 for the shipment, which represented the cost of the house to house transportation, insurance, forwarding fees of $100.00, and various other charges. El Jordan paid the charges. Mondial paid for the El Jordan shipment with a check made payable to Solymar. The check was deposited in an account by the name of "Solymar" at the City National Bank of Miami, Florida. All of Mondial's dealings were with Solymar in Port Everglades and Miami, Florida.

At the end of the ocean journey, the container was first discharged from the *M/V Delphinus* in Puerto Cortes, Honduras on August 14, 2001, and subsequently trucked from Puerto Cortes to the Customs warehouse in La Mesa, Honduras. Upon receipt of the goods in La Mesa, it was noted by Customs that the cargo was wet and damaged. Customs officials in La Mesa, Honduras, issued a certificate of damages that indicated that "[m]any cartons were found wet and their contents in bad shape, estimating the damage in the amount of $18,279.00 C.I.F." From there they were trucked in the same container to El Jordan's place of business in El Progreso, Yoro, Honduras.

The goods, which arrived at El Progreso on August 18, 2001, were removed from the container upon arrival. The agent for Solymar in San Pedro Sula was placed on

---

1. In a "house to house" shipment, a carrier supplies the container and agrees to transport it from the place of shipment, in this case the S & A warehouse, to the final destination, the warehouse of El Jordan, for a single freight charge. In a "house to house" shipment such as this one, the carrier provides both the trucking and the ocean carriage pursuant to a single bill of lading.

notice of the damage. This Solymar manager in San Pedro Sula, Honduras inspected the shipment and container after the damage was reported and confirmed the shipment was wet and that the container roof had a break in it that was repaired after the incident.

### The Loss Sustained by the Plaintiffs

Plaintiffs presented photographs of the cargo that were taken after it arrived in El Jordan's warehouse in Honduras, including photographs of the roof of the container that had holes in it. A surveyor was retained to check the cartons and found that there were no chlorides present, indicating that the wetting was caused by fresh water, most likely rain water. The marine surveyor, Marco Tulio Castaneda ("Castaneda"), estimated that the fair market value of the damaged merchandise was 40% of the invoice value of the goods and that therefore a 60% allowance should be given to El Jordan as the consignee, if it would accept the goods. According to the surveyor, this was the most cost effective way of resolving the claim.

Castaneda further estimated that the reduction in invoice value was $18,760.80, the survey fees were $300.00, and the total dollar amount of the damages was $21,769.33. New York Marine paid the total claim in a negotiated settlement under El Jordan's cargo insurance policy and obtained subrogation rights from El Jordan. By this payment, El Jordan was not fully compensated.

As a wholesaler, El Jordan typically sold goods to other retailers at 25% above their invoice value. Solymar did not contest that such wholesale price accurately reflected the fair market value of the merchandise. The invoice price for the merchandise reflects that El Jordan paid $31,268.00 for the goods, it expended approximately $2,800.00 to repair and recondition the wet television sets, and $300.00 in survey fees. The equipment that could be sold was sold for 15% of its value, or about $5,800.00.

### Solymar is the Proper Defendant

The only defense asserted by Solymar at trial was that it was some other company named Solymar that issued the bill of lading in question, collected the freight and carried the shipment to its destination. It has not contested that there was a shipment of goods, that it was damaged in transit, and the extent of the damages. It further has not contested that a claim was filed, and that it was paid. According to Solymar, because it was not the carrier of the goods, it could not be responsible for the damages sustained by the Plaintiffs.[2]

Solymar maintained that the company that issued the bill of lading was S. International, a Panamanian corporation, or alternatively, S. Inc., since that reference appears on the back of the bill of lading. Initially, Solymar asserted that there was no relation between Solymar and S. International. Solymar asserted that they were separately owned and functioned independently, although the two companies bore similar names. Solymar offered records from the Florida Secretary of State showing that other companies used the name "Solymar," and suggested this was all a matter of mistaken identity. Solymar later changed its position somewhat, admitting that it acted as the agent (in the booking of shipments of cargo and containers internationally) in Honduras for S. International, a non-vessel operating common carrier.

Solymar has the burden of proof on its affirmative defense that it was not the carrier of the shipment, and for several

**2.** Solymar also argued that the Court lacked personal jurisdiction and that service of process was insufficient. These arguments were rejected at trial, and a separate order was entered denying the motions presented.

reasons, Solymar's position is totally unsupported by the evidence. First, no evidence exists that S. International or S. Inc. exist or existed. Solymar, principally through its administrative manager in Honduras, Luis Sauceda ("Sauceda"), testified that a man named Manolo Perez was the owner of S. International. Sauceda stated that Solymar acted as agent for S. International, but he admitted that he knew of no employees that S. International had. He knew of no officers or directors of S. International. He knew of no offices or phone numbers that S. International used. He had never seen a document or contract bearing the name S. International. He had never seen any documentation attesting to the registration and/or the existence of S. International.

Indeed, Sauceda indicated he had never spoken to anyone claiming to represent S. International, nor had he ever sent any money to or received money from S. International. Sauceda received his paycheck from a Solymar account. Sauceda further stated that there was no written agreement between Solymar and S. International, only an oral "understanding." The only reason he believed a company called S. International existed is that employees of Solymar had told him so. He had no information regarding the operations of S. International.

In his sworn statement, Castaneda, the marine surveyor, states that he believes "Solymar" to refer to Solymar S. De. R.L. because he does not know of any companies named S. Inc. or S. International. Similarly, Atlantic's president, Carmen Garcia ("Garcia"), had never heard of S. Inc.. Solymar was Atlantic's only customer, and according to Garcia, Solymar was an ocean carrier that issued bills of lading on a "Solymar" bill of lading form. Atlantic acted for and on behalf of Solymar when it quoted a customer a freight rate, when it received a shipment, and when it

prepared and signed a bill of lading. Garcia knew that Solymar is registered as a carrier with the Federal Maritime Commission ("FMC").

Charles Schmidt, a licensed attorney whose practice focuses on admiralty and maritime law, also testified that he researched the internet records of the FMC and found that Solymar is the only entity shown in the FMC's listings of vessel operating common carriers, non-vessel operating common carriers and licensed freight forwarders with the word "Solymar" in its name. Thus, Solymar is the only company named "Solymar" that is registered with the FMC and the only company by that name licensed to operate as a common carrier in the United States.

After trial, Solymar presented its Motion for 1–Day Extension of Time (D.E.99) to submit documentary evidence as to the existence of a separate entity that was acting as the true ocean carrier. Having reviewed the documents that purport to prove the existence of S. International (nothing about S. Inc.), the undersigned rejects Solymar's attempt to attach some significance to these in this case. Neither the documents nor the persons who signed them, were ever disclosed to the Plaintiffs as required by Rule 26, Fed. R. Civ. P.. The documents and statements, which are not properly authenticated, merely show that an undisclosed entity, Agriculture Investment Export, Inc. ("AGRIES"), was at an unknown time created. AGRIES was the owner of the trade names "Sol y Mar" and "Solymar" (although it is unclear from the documents in what countries it could assert a claim of ownership over these names). AGRIES' attorney was authorized to promote AGRIES' shipping business in Honduras, Nicaragua, Guatemala and El Salvador. The documents fail to indicate what affiliation AGRIES has with Solymar, S. Inc. or S. International, whether AGRIES is an ocean carrier,

and/or what connection AGRIES has with the shipment in question. Solymar's late-filed documents prove nothing.

Second, all of the evidence points to Solymar as the responsible carrier, and as the party that conducted business here in Miami. Yanko Haraudou ("Haraudou"), called by Solymar to testify, indicated that in August of 2001, he was the traffic manager for Atlantic and that he, or someone who worked in his department, prepared and signed the bill of lading at issue. He admitted that he received the Mondial check in payment for the freight, and that his company deposited that check into an account in the name of Solymar, which he says is owned by Solymar. The Solymar account was used by Atlantic to pay for all of the operating expenses of the Solymar ships including the ocean terminal, stevedoring and longshoring, trucking expenses, salaries and expenses of Atlantic, and fuel for the ship.

In April, 2002, Haraudou left Atlantic and became traffic manager for Cha Employment Services, Inc. ("Cha"). Cha, a Florida corporation, is engaged in the same line of business as Atlantic, i.e., agent for steamship lines responsible for customer service and arranging for the movement of containers from Florida to Honduras, Nicaragua and other locations. At Cha, Haraudou, whose business card and letterhead bear the name "Solymar," and whose employees answer phones identifying the company "Solymar" rather than Cha, became the regional manager and agent for Solymar, which he claims is S. International. Haraudou introduces himself as the regional manager of "Solymar." All employees of Cha known to Haraudou only engage in business for "Solymar." Haraudou does not report to anyone at Cha; rather, he reports to Patricia Elvir, the president and manager of Solymar in Honduras. Cha is simply a legal name Solymar uses in the United States.

According to Haraudou, Cha received checks for freight from shippers and deposited these into the same Solymar account into which Mondial had made the deposit in this case. The "Solymar" account was used by Cha in the same way Atlantic had used it—to pay for all of the operating expenses of the "Solymar" ships including the ocean terminal, stevedoring, longshoring and trucking expenses, salaries and expenses of Cha, and fuel for the ship.

On a weekly basis Haraudou still issues 25 to 40 "Solymar" bills of lading identical to the one issued to El Jordan, but these bills of lading are issued by Cha for S. International, not Solymar. He does so notwithstanding his knowledge that S. International is not registered as a carrier with the FMC, and his awareness that to issue bills of lading for a non-registered carrier is against the law. According to Haraudou, Solymar is an agent in Honduras for S. International, while Cha is the agent in the United States for S. International, and they are all separate companies. When he reports to his "superiors," he reports to Solymar in Honduras.

Haraudou claims that S. International was the carrier of the shipment in this case because it is the company that issued the bill of lading. Even though Haraudou claimed to be an agent for S. International, he did not know the names of any officers, directors, or even employees of that company. He did not have an address or phone number for the company, has never seen a contract with the company's name on it, has never sent to or received from S. International any money, and has never spoken to anyone claiming to represent S. International. The only reason he believes S. International exists is that employees of Solymar have told him so. Haraudou's testimony supports a finding that Solymar was the only carrier involved in the present case.

Third, Solymar has made admissions in papers filed in other litigation in the Southern District of Florida, that support a finding that it was the responsible carrier. In *King Ocean Services, Ltd. v. Solymar S. De R.L.,* Case No. 02–22845–Civ–King, the plaintiff alleged that it was owed $70,829.31 by Solymar arising out of a lease of containers by the plaintiff to Solymar for use aboard the *M/V Delphinus* for shipments between Port Everglades and Honduras in 2001 and 2002. In its Answer, Solymar admitted that it "was a steamship company engaged in the transport of goods for hire via ocean transport, and is a vessel operating common carrier (VOCC) registered with the United States Federal Maritime Commission." That case was settled before trial and dismissed by the court upon stipulation of the parties.

In *American Home Assurance Co. v. Solymar S. De R.L.,* Case No. 01–7722–Civ–Roettger, Solymar was sued by the insurer of a shipment of computer parts which was stolen from Solymar's terminal operator, St. John's Shipping Company, in Port Everglades, Florida. In its Motion for Summary Judgment, filed on August 20, 2002, Solymar sought to have its liability limited as a carrier under the Carriage of Goods by Sea Act ("COGSA"), 46 App. U.S.C. § 1300–1315. It stated in its Motion that "Solymar is an international corporation engaged in business as an ocean carrier in international commerce." It asserted that it is an ocean carrier operating ships into and out of Port Everglades, Florida, that it issues bills of lading for shipments to Honduras, and that it is entitled to the protections and limitations of COGSA. In the Motion and answers to interrogatories, it admitted it issued the bill of lading, which, upon a review, is identical in every respect to the bill of lading issued to El Jordan in this case. Transcripts of deposition testimony taken in *American Home* further demonstrate that Solymar does business in Florida, in that (1) it has two offices in Florida, one in Miami and one in Port Everglades; (2) it operates two vessels in Florida in the spring and one the rest of the year; (3) it has a trucking subsidiary named Soltrans with an office in Miami; (4) it has a stevedore yard at the St. John's Terminal in Port Everglades; (5) it books shipments in Miami through agents, from 1996 through 2002 with Atlantic and since then with Cha; and (6) Solymar bills of lading are printed in the United States by Solymar's agents.

Plaintiffs suggest Solymar's defense "has been a fraud perpetrated by Solymar," and that "sanctions are appropriate." (Plaintiffs' Objection to the Admission into Evidence of the Documents Filed by Solymar, S. De R.L. by its Notice of Filing Dated January 27, 2004 and Motion for Sanctions Under Rule 37(c)(1), (D.E. 102), p. 3). Plaintiffs are not too far off the mark. There is simply no evidence that an agent acting for S. International, or the elusive S. Inc., issued the bill of lading being sued upon. There is no credible evidence that S. International or S. Inc. transacted any business in Florida, let alone the transaction in question. Defense counsel's heroic efforts to present the defense of "We didn't do it—they did" was simply that—brazen, but totally unsupported. Because Solymar has offered no evidence to support its assertion that S. International even exists, the Court concludes that Solymar is the carrier of the shipment, the issuer of the bill of lading, and is liable to the Plaintiffs for their damages.

### CONCLUSIONS OF LAW

#### Damages Recoverable Under COGSA and the Facts of the Case

COGSA governs "all contracts for carriage of goods by sea to or from ports

of the United States in foreign trade." *Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co.,* 215 F.3d 1217, 1220 (11th Cir.2000) (quoting 46 App. U.S.C. § 1312). The parties stipulated that COGSA applies to the shipment from the time it was loaded aboard the vessel in Port Everglades, Florida until the time that it was discharged from the vessel in Puerto Cortes, Honduras.

■■■■ Only carriers who issue bills of lading for the carriage of goods to or from the United States are entitled to protection under COGSA. COGSA defines the term "carrier" as "the owner or the charterer who enters into a contract of carriage with a shipper." 46 App. U.S.C. § 1301(a). Under COGSA, to establish a *prima facie* case of liability against a carrier, a shipper must show that the carrier received the cargo in good condition but unloaded it in damaged condition at its destination. *Polo Ralph Lauren,* 215 F.3d at 1220; *Hale Container Line, Inc. v. Houston Sea Packing Co., Inc.,* 137 F.3d 1455, 1468 (11th Cir.1998). *See also Plastique Tags, Inc. v. Asia Trans Line, Inc.,* 83 F.3d 1367, 1369 (11th Cir.1996) (The shipper meets this burden by showing: "1) full delivery of the goods in good condition to the carrier, and 2) outturn by the carrier of the cargo with damaged or missing goods.") (citing *Sony Magnetic Prods., Inc. v. Merivienti O/Y,* 863 F.2d 1537, 1539 (11th Cir.1989)). Once the shipper satisfies its *prima facie* case, the burden then "shifts to the carrier to prove that it either exercised due diligence to prevent damage to the cargo by handling, stowing, and carrying the cargo in a seaworthy ship, or that the harm resulted from an 'uncontrollable' cause of loss as statutorily defined." *Hale,* 137 F.3d at 1468.

■■■■ Under COGSA, "a bill of lading shall be *prima facie* evidence of the receipt by the carrier of the goods as therein described . . . ." *Plastique Tags,* 83 F.3d at 1369 (quoting 46 App. U.S.C. § 1303(4) (1994)). A clean bill of lading " 'constitutes an acknowledgment by a carrier that it has received the described goods for shipment.' " *Id.* at 1369–70 (quoting *Berisford Metals Corp. v. S/S Salvador,* 779 F.2d 841, 845 (2d Cir.1985) (because bill of lading contained limiting language and the amount of goods in the sealed container was not verifiable by the carrier, bill of lading was not *prima facie* proof of delivery to the carrier of the full amount)). The bill of lading has been described as the "contract of carriage" and the "touchstone of our analysis [as] the contractual agreement between the parties." *Fireman's Fund Ins. Co. v. Tropical Shipping and Constr. Co., Ltd.,* 254 F.3d 987, 997 (11th Cir.2001) (quoting *Fishman & Tobin v. Tropical Shipping & Constr. Co., Ltd.,* 240 F.3d 956, 960 (11th Cir.2001); citing *Hale,* 137 F.3d at 1469).

■■■■ Here, the clean bill of lading sets forth the contents delivered to Solymar as consisting of a 45–foot container with 677 packages of electrical articles. The photos in evidence and undisputed testimony show the contents to have been given to the shipper in good condition but delivered to El Jordan in damaged condition. El Jordan satisfied its *prima facie* case of liability. Thereupon, the burden shifted to Solymar to show it exercised due diligence to prevent damage to this cargo by loading it onto a seaworthy ship, or that the loss was "uncontrollable." Solymar showed neither, and thus, liability is clearly established.

■■■■ Even assuming Solymar was acting on behalf of S. Inc. or S. International, as has been suggested, the latter's identity was not disclosed to El Jordan in either the bill of lading or in any precontract communications by Solymar. Admittedly, one who acts in the capacity of an agent for a disclosed principal is not liable

for claims arising out of a contract executed by the agent on behalf of that principal. *Chung, Yong Il v. Overseas Navigation Co., Ltd.,* 774 F.2d 1043, 1056 (11th Cir. 1985) (citing *Lake City Stevedores v. East–West Shipping Agencies,* 474 F.2d 1060, 1063 (5th Cir.1973)). "An agent may however bind himself if he conducts himself in such a way as to indicate an intent to be bound." *Lake City Stevedores,* 474 F.2d at 1063 (citations omitted). *Cf. Int'l Drilling Co., N.v. v. M/V Doriefs,* 291 F.Supp. 479, 485 (S.D.N.Y.1968) ("when Cook signed the bill of lading ... it was clear to all parties that he did so in the capacity as agent for Marlin and bound only his principal thereto."). Here, although Solymar claims to have acted as an agent, it did not act as agent for a disclosed principal, and therefore, Solymar became liable as the principal upon the contract. *See, e.g., Powers v. Coffeyville Livestock Sales Co., Inc.,* 665 F.2d 311 (10th Cir.1981) ("Under traditional agency law, an agent is liable as if it were the principal when the agent acts for an undisclosed principal. This rule applies whether the agent holds itself out as principal or only as agent but does not disclose the identity of its principal.") (citations omitted); *In the Matter of Uiterwyk Corp.,* 77 B.R. 907, 908 (Bkrtcy.M.D.Fla. 1987) ("The general rationale behind undisclosed principal theory is that one who acts as an agent for a third party in executing a contract, is personally liable thereon, if at the time of making the contract, he does not disclose his agency and the identity of his principal, notwithstanding his authority as agent to execute the contract.") (citing 3 Am.Jur.2d, Agency § 317).

The damages sought by El Jordan were not rebutted with any persuasive testimony or evidence. The proper measure of damages in a suit for damage to cargo is the difference between the fair market value of the cargo in its sound condition at the expected place of delivery and the fair market value in its damaged condition. *Terman Foods, Inc. v. Omega Lines,* 707 F.2d 1225, 1228 (11th Cir.1983). In the present case, the fair market value of the electronic goods in their sound condition was 125% of their invoice value of $31,268.00, or $39,085.00. El Jordan spent approximately $2,800.00 to repair and recondition the wet television sets and $300.00 in survey fees. The reconditioned sets were sold for 15% of their value, or $5,800.00. El Jordan's cargo damage was therefore $36,385.00.

New York Marine paid El Jordan $21,679.33 in a negotiated settlement of its cargo insurance policy, which did not fully compensate El Jordan for its loss. Although the issue of the $500.00 per-package limitation on carrier liability under COGSA, 46 App. U.S.C. § 1304(5),[3] was raised by Solymar in its Answer to the Complaint as an affirmative defense, Solymar neglected to address this issue at trial or in its post-trial submissions. If Plaintiffs are entitled to the actual damages proven at trial, the $36,385.00, this shall be divided between the Plaintiffs as follows: New York Marine is to receive $21,679.33 and El Jordan is to receive the balance of $14,405.67. Plaintiffs are also entitled to an award of pre-judgment interest.

For all of the foregoing reasons, it is

**3.** This subsection provides that "[n]either the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier." 46 App. U.S.C. § 1304(5).

**ORDERED AND ADJUDGED** as follows:

1. Within *ten (10) days* of the date of this Order, the parties to submit memoranda addressing the amount of damages to which Plaintiffs are entitled under COGSA in light of the foregoing findings of fact and conclusions of law.

2. Within *ten (10) days* of the date of this Order, the parties are to submit proposed calculations on interest and costs, including the methods and formulas used to arrive at the amounts calculated, for inclusion in the final judgment.

3. Pursuant to Rule 58, Fed.R.Civ.P., final judgment will be entered in favor of Plaintiffs, and against Solymar, by separate order in accordance with the foregoing findings of fact and conclusions of law and the parties' submissions in response to paragraphs 1 and 2 above.

4. Any of the foregoing conclusions of law which may represent findings of fact are adopted as findings of fact.

5. If Plaintiffs intend to recover attorney's fees and costs, they shall file a separate motion for attorney's fees and costs in accordance with S.D. Fla. L.R. 7.3 within *ten (10) days* of the entry of the final judgment in this matter.